George Andrews, J.,
delivered the opinion of the Court.
The bill in this cause was filed by complainants, who constitute the firm of Churchill, Johnson & Co., to set aside voluntary conveyances made by Allen T. Wells, and alleged to have been made in fraud of creditors.
Wells was a merchant, doing a large business in the City of Memphis, having been in business about thirteen years prior to the making of the deeds in question, in 1859. His purchases of goods, in the course of his *366 business, amounted to $116,743.59 for the, year 1857, and to $166,813.83 for the year 1858.
. On the 10th of September, 1859, Wells conveyed to Charles Kortreeht, for the nominal consideration of $8,000, two lots in the City of Memphis; and on the same day, Kortreeht- reconveyed one of the said lots to said Wells, to hold in trust for Wells’ children, and conveyed the other lot directly to the wife of said Wells, to her separate use. The two last-mentioned deeds expressed the consideration, respectively, of five thousand and three thousand dollars; but no consideration was, in fact, paid for any of the conveyances — the design of the whole transaction being simply to effect settlements for the benefit of the wife and children of Wells. These three conveyances were all duly registered on the 12th day of September, 1859. The total value of both lots, at this time, was probably about $10,000. The lot settled on Wells’ children was his family residence; and an old and not very valuable house situated thereon was torn away to make room for the new house subsequently erected by him.
At the time of making these conveyances, on the 10th of September, 1859, the total indebtedness of Wells was $121,427.24. He is shown to have had at the same time, besides the lots in question, a village lot worth $5,000, but subject to a mortgage for $1,300, situated, in a town in the interior of New York. He may also have owned, at this time, two lots on Jessamine street, in the City of Memphis, and worth $3,280, as he appears to have been the owner of them some months afterward.
*367 He owned, at tbe same time, in personal property, outside of bis mercantile business, about $3,200. His merchandise on hand, at cost pricess, ten per cent, added, amounted to $105,741.58, and the accounts and bills receivable due him, ■ to $34,314.21. Of these last, about $17,000 were recent debts, which were mostly good. About $9,500 was of older date, and but a small part was ever collected; and the remainder — about $7,400— consisted . of old accounts of little or no value, which were never collected.
It is doubtful if the entire property of Wells, besides the lots in controversy, was, at this time, equal in value to the amount of his liabilities; it is almost certain that it could not have sufficed, if forced upon the market, to pay those liabilities. The question of solvency depends upon whether enough can be realized from the property of the debtor to pay his liabilities — not upon the nominal value of unsalable goods: Parish vs. Murphree, 13 How., 100.
Some time in 1859, but at what precise time does not appear, Wells added a wholesale department to his mercantile establishment. His purchases for the month of August, 1859, amounted to $11,401.41. After making the settlements on his wife and children, he continued his business; and from that time to the 5th day of June, 1860, when he suspended, he purchased goods on credit, in the regular course of his business, to the amount of about $260,000; his purchases for September, October and November, 1859, being about $35,000 per month. His purchases for December, 1859, were about $8,000, *368 and for January, February and March, 1860, about $78,000, $29,000 and $38,000, respectively.
On the 20th day of January, 1860, Wells made a contract for the erection of a double tenement frame house on the lot on Court Street, which he had settled on his children. The price agreed to be paid for the house was $9,750, and Wells paid therefor to the contractors, including extras, $9,912.48. Of this amount, $3,280 was paid according to contract, in two lots on Jessamine street, and the remainder in cash and dry goods, $3,500 in cash being drawn from the mercantile business, and applied to this purpose between March 14th and June 5th, 1860.
On the 5th day of June, 1860, Wells suspended business, and made a general assignment of his property for the benefit of his creditors. His indebtedness then amounting to about $250,000,' most of which was owing to merchants in the eastern cities. The complainants resided in New York.
Wells was indebted to complainants on the 10th of September, 1859, by notes given for goods bought previous to that time; but these notes were fully paid previous to the assignment made June 5th, 1860; the debts now due to complainants having resulted from other sales made during that interval, but before the payment of the previous notes; so that there was no time after September 10th, 1859, when Wells was not indebted to the complainants. The amount due complainants is evidenced by the note, for $3,116.67, dated October 4, 1859, payable at eight months after date; and the goods for the. price which it was given, were probably pur *369 chased shortly before that time, as the proof shows that Wells’ custom was to settle the amount of his purchases of goods by note, after receiving the invoices.
During the interval between September 10th, 1859, and June 5th, 1860, Wells continued to buy goods, usually on a credit of from six to eight months, and to pay off his indebtedness as fast as it matured, from proceeds of sales and collections. In this manner he paid off, prior to June 5th, 1860, the entire amount of his indebtedness existing September 10th, 1859, except one debt of $117.50 due to one Butler, who is not one of the complainants, and possibly another debt of about $300, due to another party, which was afterwards so confused with subsequent transactions, as to render it difficult to say whether it can properly be said to be paid or not.
Wells, in his answer, denies all intention to defraud existing or subsequent creditors. He states that shortly after making the settements, he visited the eastern cities for the purpose of purchasing his fall supply of goods, as was his annual custom, and as he expected and intended to do when he made the settlements; that he did not make the settlements because of that intention, but in good faith to provide, while he was able, as he then knew himself to be, a moderate competence for his family, in the event of subsequent misfortunes, to which every merchant is liable.
The Chancellor, upon final hearing, held the deeds of settlement to be valid, and refused any relief to the complainants as to the land conveyed, but gave them a decree against Wells for the amount of their debt.
The statute of 13 Elizabeth, ch. 5, is substantially *370 re-enacted in the Code of this State, sec. 1759. It is declared that “every gift, grant, conveyance of lands, tenements, etc., had, or made and contrived, of malice, fraud, covin, collusion or guile, to the intent or purpose to delay, hinder or defraud creditors, etc., shall be deemed and taken, only as against the person, his heirs, etc.,whose debts, suits, demands, etc., by such guileful and covinous practices as aforesaid, shall, or might be in any wise disturbed, hindered, delayed or defrauded, to be clearly and utterly void.”
It would be profitless to attempt an analysis of the multitude of cases in which the proper construction and application of this statute have been discussed by the Courts of England and America. The cases are well collected in the note to Sexton vs. Wheaton, 1 Am. Lead. Cas., 17. There is on some points, much diversity of decision. But the cases are all agreed so far as this, that a voluntary conveyance made with the actual intent to defraud either existing or subsequent creditors, is void as to the creditors to whom the fraudulent intent extends.
It is undoubtedly the law of this State, that a voluntary conveyance, made by a person who is at the time heavily indebted, and of such a proportion of his property that it must necessarly operate to delay or defeat his existing creditors, is to be presumed fraudulent as to them. A person must be held to intend the fraud which his acts necessarily produces: 3 Hum., 121; 4 Sneed, 124; 4 Yerg., 548; 1 Head, 324; 1 Story Eq., Sec. 187.
The settlements made by Wells in favor of his family were clearly fraudulent as to his then existing cred *371 itors. The whole of his estate being barely, if at all, equal in nominal value to the amount of his indebtedness, and being, in fact, insufficient, if converted into money in the usual manner, to discharge the amount of that indebtedness, he proceeds to settle property to the value of $10,000 upon his family. If the property which he reserved, including his old stock of merchandise at cost prices, was to be estimated as equal in nominal value to his existing indebtedness, that did not constitute such sufficient security for his debts as his creditors were entitled to require. His creditors had the right to expect satisfaction of their debts out of his property, and he had no right in law or morals, to throw upon them the loss which must necessarily occur in converting such a property into money: 13 How., 100; 32 Miss., 369.
Without attempting to decide several interesting questions, which have been ably argued in this cause, in regard to the various circumstances under which a voluntary conveyance may be attacked as fraudulent by a subsequent creditor, we are compelled to hold the settlements made by Wells in the present case to be void as against the complainants.
The complainants had previously dealt with Wells, and at the time the settlements were made were actually his creditors, by notes dated the previous February, and then nearly matured. Ho actual notice was given to them, so far as appears, of the disposition which Wells had made of his property. They did business in the City of Hew York, and had no reason to suppose that Wells intended any such disposition; and we can not *372 suppose tliat they had any knowledge of it. Wells occupied the property; and no change of possession took place after the settlement, nor anything to call the attention of his creditors and those proposing to become his creditors, to the fact that he had placed a material proportion of his property beyond their reach.
It was said in Martin vs. Oliver, 9 Hum., 565, that where a voluntary deed is duly registered, persons subsequently dealing with the grantor are charged with knowledge of the true state of the title of the property of which he is the ostensible owner; and if they trust him upon the faith of such visible ownership, it is the 'fault of their own want of vigilance, and it can not properly be said that they are defrauded.
That case was undoubtedly correctly decided; and the principle of the decision is applicable to every case wherein the creditor, at the time he extends the credit, knows or is bound to ascertain the actual condition of his debtor’s estate.
But persons to whom a debt accrues have the right ■ to expect- that their debtor will deal fairly and in good faith with them; and if, upon the eve of an indebtedness about to be incurred, and with a view thereto, and without the knowledge of the party extending the credit, the debtor makes a voluntary conveyance of property, upon which he knows that his contemplated creditor relies, or has a right to rely, this is an actual fraud, producing the same results, both upon existing and subsequent creditors. And such an act is not relieved from its fraudulent character by the mere fact that the conveyance may be placed upon record, if *373 the creditor has no actual notice, and the conveyance, without his negligence, operates as a surprise upon him.
The complainants had already dealt with Well?, and were his creditors at the time of making the settlements. Wells’ present indebtedness to them must have accrued within a ’ very short time, and probably within a few days after the deeds were placed upon record. We cannot say that distant merchants, under circumstances liiie these, were bound to send to the office of the Register of Deeds, at each successive sale, to ascertain whether the purchaser might not, since the last invoice, have given away his property.
The fact is evident that Wells, in view of a large indebtedness, to be immediately increased, and for the purpose of providing for himself and family, made this voluntary settlement of an unreasonable proportion of his estate; that he did this without the knowledge, or the reasonable opportunity for knowledge of creditors who had already dealt with him, and to whom he proposed a still further and larger indebtedness, and in utter recklessness of the security of existing or subsequent creditors. He knew, or ought to have known, that his situation was precarious; and he was intending, by extending his operations, to make it still more so; and his intention was, without the knowledge of the persons to whom he proposed to become indebted, to provide for himself and his family, by throwing the risk of his future operations upon his existing and future creditors.
It has frequently been said, in discussion of this subject, that a voluntary conveyance is not void as to sub *374 sequent creditors, unless fraud in fact be shown. But where, as in this case, the deed is made with direct reference to immediate, future indebtedness, and with the actual intent lo deprive the future creditor of security, upon which he has the right to rely, such intent is actually fraudulent within the meaning of the rule: 39 N. Y., 170; 1 Bailey, 340; 1 Story Eq. Jur., sec. 356; 10 N. Y., 227; 6 Paige, 538.
The considerations already expressed are sufficient, in our view, to show that the settlements made by Wells must be held fraudulent to the complainants, without reference to the further fact, to which we might look as an evidence of his intentions, that he, at a time when he must have known or suspected that he was about tp become bankrupt, recklessly expended $10,000 more of the property to which his creditors were entitled, in improvements upon the property already conveyed away.
The deeds of settlement must be declared void, and the property subjected to the payment of the claims of complainants.
The complainants, in some of the bills consolidated with that of Churchill, Johnson & Co., occupy the same situation that those parties do, of being both prior and subsequent creditors. Others are subsequent creditors only. But as the deeds must be set aside, the whole property will be treated as assets, and the complainants in the several bills will be .entitled to share in the proceeds, according to their respective priorities, if they have any, and the amounts of their respective claims.
*375 It is charged that the sale by "Wells to Kortrecht, of the negro, on the day the assignment for the benefit of creditors was made, was fraudulent, for the reason that it was made in contemplation of the assignment, and with the knowledge on the part of Kortrecht that Wells intented to place his property beyond the just demands of his creditors, and to put the money in his pocket. It is not charged that the slave was not paid-for by Kortrecht; that the sale was for an insufficient price, or upon any trust for the benefit of Wells. , All fraud or knowledge of fraud is denied by the answer of Kortr.echt, and there is no proof of fraud as to this transaction. Wells had the right, in good faith, to sell the slave to Kortrecht or to any one else, for the purpose of raising money; and the fact that he intended immediately to make an assignment of his remaining property, would not, without more, render the sale fraudulent.
The decree below must be modified in accordance herewith.