STATE ex rel. v. NASHVILLE TRUST CO. et al.—
190 S. W. (2d) 785.

Middle Section.   November 4, 1944.

Petition for Certiorari denied by Supreme Court, October 13, 1945.

Petition for Rehearing denied by Supreme Court, December 1, 1945.

390

W. M. Fuqua and R. C. Boyce, both of Nashville, for appellants.

Nat Tipton, Assistant Atty. Gen., Charles C. Trabue, Sp. Counsel, of Nashville, and Roy H. Beeler, Atty. Gen., for appellee.

FELTS, J. The State of Tennessee, a judgment creditor of Rogers Caldwell for $4,354,702.73, seeks by this suit to subject certain land on which he put $350,133.80 of im-

provements and which was later given him by his father in a "spendthrift trust."

The land is a tract of 204 acres near the Franklin Pike some seven miles from Nashville. James E. Caldwell, father of Rogers Caldwell, bought the land in 1909 for $18,436.00. In 1917 he allowed his son Rogers to move onto the land and live there until the improvements were begun. He had declared his purpose to give the land to Rogers in trust free from the claims of creditors. Acting upon this understanding and with his father's consent, Rogers Caldwell named the place "Brentwood Hall" and built thereon a mansion and other improvements costing $350,133.80. He did this during a period of two years from June, 1927 to June, 1929.

He had little or no property except his stock in Caldwell & Company, a corporation which he had organized in 1917 and which described itself as investment bankers and dealt in stocks and bonds of private and public corporations. He owned all the stock in Caldwell & Company and Caldwell & Company owned all the stock in two subsidiaries, Rogers Caldwell & Company and the Bank of Tennessee. Rogers Caldwell & Company was a corporation which had been organized to sell Caldwell & Company's securities in New York and the other great money centers in that section. The Bank of Tennessee had been organized under a banking charter to receive deposits and it was operated in the Nashville office of Caldwell & Company.

The Bank of Tennessee was designated a public depository, and from 1924 to 1930 it was continuously receiving large deposits from cities, counties, and the State of Tennessee. Pursuant to Code, sec. 230, it made bonds to secure the State's deposits. The sureties on these bonds were Rogers Caldwell and employees of Caldwell

& Company. These bonds ran into millions of dollars. From February, 1927, to November, 1930, Caldwell & Company did an enormous business buying and selling bond issues of counties and cities, sponsoring numerous private corporations and selling their stocks or bonds, and acquiring, with others, control of several banks and insurance companies.

Caldwell & Company, Rogers Caldwell & Company, and the Bank of Tennessee failed November 6, 1930. At that time Rogers Caldwell was surety on four depository bonds to the State of Tennessee aggregating $6,250,000. On November 18, 1930, there was recorded a deed of James E. Caldwell and wife conveying this 204 acres of land to the Nashville Trust Company, trustee, in a spendthrift trust for Rogers Caldwell and any child that might be born to him. This deed had been dated September 19, 1930, and its acknowledgment had been dated the same day. It vested the legal title in the Nashville Trust Company, trustee, and gave Rogers Caldwell and any child of his the right to occupy and enjoy the land for life, but without the right to alienate it and without its being in any wise liable for any debt of his or of any child he might have.

Within a day or two after these failures the superintendent of banks brought a suit to liquidate the Bank of Tennessee, and creditors of Caldwell & Company brought a receivership suit in the Federal Court at Nashville to wind up Caldwell & Company. The State of Tennessee brought suit against Rogers Caldwell and the other sureties on these four depository bonds. Also on December 4, 1930, the State filed the original bill in this cause against the Nashville Trust Company, trustee, James E. Caldwell, Rogers Caldwell, and the unborn children of Rogers Caldwell, to subject the land to the payment

of the obligation of Rogers Caldwell as surety on these bonds.

He took the position that the amount of his liability as surety could not be determined until the principal, the Bank of Tennessee, had been liquidated. So the present suit was delayed until that was done. On December 1,. 1938, the State filed an amended and supplemental bill in the present suit stating that the Bank of Tennessee had been liquidated and had paid to the State as a preferred creditor only a small dividend; that on November 21, 1938 the State had recovered a judgment on these four depository bonds against Rogers Caldwell for $4,-354,702.73; and that execution had been issued and returned nulla bona. Since there is no question upon the pleadings, their averments need not be detailed. The case made by the bill, as supplemented and amended, set forth two grounds for relief:

(1) That Rogers Caldwell put the $350,133.80 of improvements on the land of his father with a secret agreement or understanding with his father that his father would give him back the improvements and the land in a trust free from his creditors; that he was largely indebted, engaged in hazardous speculation, expected to incur debts beyond his ability to pay, and transferred this $350,133.80 to his father with an actual intent to hinder, delay, and defraud his existing and subsequent creditors; that this intent was known and participated in by the father, the transferee; that this transfer and the transfer to the Nashville Trust Company, trustee, were fraudulent conveyances; and that the State has the right to have them set aside and to subject the whole value of the land up to the $350,133.80 to the payment of its debt.

(2) That, regardless of any actual intent to defraud his creditors, the making of these improvements by

Rogers Caldwell, upon the understanding with his father that the land with these improvements would be given him in trust free from his creditors, was a contribution by him to the trust property and to that extent a creation by him of a trust for his own benefit; that since one may not have and enjoy, free from his creditors, property which he has himself paid for or contributed to, the trust was a fraud in law upon his creditors to the extent that his contribution enhanced the value of the property; and that the State has the right to subject the property to the extent of such enhancement.

The separate answers of Rogers Caldwell and James E. Caldwell denied that the State was entitled to any relief upon either of these grounds, denied all the charges of fraud, denied that the making of the improvements was a fraudulent conveyance or a contribution by Rogers Caldwell to the trust property, and denied that the conveyance to the Nashville Trust Company, trustee, was fraudulent either in fact or in law. These answers averred that James E. Caldwell had given each of his other children a home in trust free from claims of creditors; that while he had no definite understanding with Rogers he had stated to Rogers that he would give Rogers this 204 acres of land in the same manner as he had made gifts to his other children; that Rogers made the improvements with the expectation that his father would so give him the land; that at that time he was a very rich man and was only trying to build for himself a home suitable for one of his great wealth; that he had a right to make the improvements and the making of them took nothing from his creditors because his remaining property was greatly in excess of any debts he then had or ever expected to have; and that the subsequent failure of himself and his companies was altogether unforesee-

able and solely due to the great economic depression which swept over the country in 1929 and 1930.

Upon these issues a large amount of proof was taken, and the cause was heard according to the forms of chancery. On March 27, 1942, the chancellor filed his opinion stating his findings of fact and conclusions of law. He found that there was no satisfactory proof of fraud on the part of Rogers Caldwell or James E. Caldwell, and held that the State was not entitled to any relief upon its theory of fraudulent conveyance. But he held that the making of the improvements was a contribution by Rogers Caldwell to the trust property to the extent that they permanently enhanced its value and that to this extent the State had a right to subject the property. On April 17, 1942, he entered a decree giving the State a lien on the land for the amount by which its value had been enhanced by the improvements, directing a sale of the land if necessary, and ordering a reference to determine the amount of the enhancement.

Both sides appealed, the defendants insisting that the chancellor should have dismissed the bill and the State insisting that he should have sustained its right to subject the whole value of the land up to the amount of $350,133.80 to the payment of its debt. The cause was heard in this Court January 18, 1943. While we had it under consideration, counsel for all parties asked that the case be restored to the docket and continued pending a decision by our Supreme Court of the related case of State v. Caldwell, 181 Tenn. 74, 178 S. W. (2d) 624, 151 A. L. R. 1410. After that decision this cause was reargued in this Court May 26, 1944, and elaborate briefs were filed.

We first consider the questions made by the errors assigned by defendants, the same assignments being

made on behalf of Rogers Caldwell, James E. Caldwell, and the Nashville Trust Company, trustee.

They insist that upon his finding that there was no fraud in the transaction the chancellor ought to have dismissed the bill. They rest this insistence upon the general principles of the common law that everything affixed to land becomes part of it and vests in its owner; and that one who puts improvements on land of another, without any contract with the owner or any claim to the land, cannot look to the owner or the land for compensation for such improvements.

The argument is that when Rogers Caldwell made the improvements on the land of James E. Caldwell, he did so without any contract with the owner or any claim to the land; that he had nothing but a mere expectation that his father might later give him the land; that since such expectation could be defeated whenever the father chose, it could not be the basis of any legal or equitable right; that when he thus made the improvements they became the property of his father and he had no right to recover therefor either from the owner or the land; that his creditors could have no higher right, there being no fraud against them; and that the subsequent conveyance to the trustee added nothing to their right but expressly excluded such right. Counsel rely on Ewing v. Cantrell, 19 Tenn. 364; McFerrin v. Carter, 62 Tenn. 335; Holder v. Crump, 78 Tenn. 320.

We cannot follow this argument. The principles invoked and the cases cited are not applicable to this case. It is true in those cases creditors were not allowed to follow money used by debtors (a son in the first case and husbands in the other two cases) in improving lands of married women. But there are two important differences between this case and those: (1) In those cases the owners

of the land, being married women, were under the common law disabilities of coverture, under domination of their husbands, powerless to prevent the improvements (McFerrin v. Carter, 62 Tenn. 335, 337), and unable to charge the land or part with it except in the manner prescribed in the statute or in the deed under which the wife held the land as her separate estate. (Holder v. Crump, 78 Tenn. 320, 323); and (2) the improvements were intended to be, and were, an outright and absolute gift to the landowner, without any trust, secret or otherwise, for the improver and without any intent to defraud his creditors.

In the present case the father and son were sui juris, the father of course could have prevented the improvements, and they were not intended to be, and were not, a gift by the son to the father. Both of them say the son made the improvements for himself and not the father, and both admit there was an understanding between them that the father would give the land and the improvements to the son in trust free from creditors. The father says that before and during all the time the improvements were being made he had a will which, if he had died, would have effectuated this understanding; and that he became dissatisfied with the will, destroyed it, and made the deed of September 19, 1930, putting the property into a spendthrift trust for the son and any child the son might have. So, regarded in its most favorable aspect to defendants, this is simply a case of a man investing $350,000 of his money into property which was intended to be, and was, given him in trust to be beyond the reach of his creditors.

Liability of one's property for his debts was regarded at common law as a necessary incident of ownership. Any attempted restraint against such liability was

void as contrary to public policy and repugnant to the very notion of property. Our statute, Code, sec. 8197, declares: "Every debtor's property, except such as may be specially exempt by law, is assets for the satisfaction of all his just debts." See, also, section 7271. The only exceptions to this general principle of liability are those enacted by the statutes of exemptions and that created under the doctrine of spendthrift trusts.

██ But the policy which led to the enactment of such statutes is quite different from that under which such trusts are sustained. The former is protection of the debtor and the latter is consideration for the right of the donor or settlor to dispose of his property and control his bounty as he wishes, within the limits allowed by law. Vines v. Vines, 143 Tenn. 517, 535, 226 S. W. 1039, 1043. This latter has been debatable ground, has never been accepted in England, and was finally accepted in Tennnessee only after much conflict of opinion. Cf. Turley v. Massengill, 75 Tenn. 353, and Hooberry v. Harding, 78 Tenn. 392, with Jourolmon v. Massengill, 86 Tenn. 81, 5 S. W. 719. Such a trust must be an active one, declared by will or deed duly recorded, and created by, or the property must have proceeded from, some person other than the beneficiary himself, Code, sec. 10353. Such a record, being notice to the public, prevents the beneficiary from misleading creditors, or obtaining false credit upon his apparent ownership of the trust property. Thus the real reason for sustaining such a trust is that, as the property in it comes from another, it takes nothing from the beneficiary's creditors. Jourolmon v. Massengill, 86 Tenn. 81, 110, 111, 5 S. W. 719, 728, 729; Porter v. Lee, 88 Tenn. 782, 793, 794, 14 S. W. 218, 220; White v. O'Bryan, 148 Tenn. 18, 42, 43, 251 S. W. 785, 792; Tramell v. Tramell, 162 Tenn. 1, 29-31, 32 S. W. (2d) 1025, 35

S. W. (2d) 574, 576, 577; Mayberry v. Redmond, 169 Tenn. 190, 83 S. W. (2d) 897; State v. Caldwell, 181 Tenn. 74, 178 S. W. (2d) 624, 151 A. L. R. 1410; Davis v. Mitchell, 27 Tenn. App. 182, 178 S. W. (2d) 889. Cf. Sternberger v. Glenn, 175 Tenn. 644, 137 S. W. (2d) 269.

██ ██ But the case is very different when one takes his own property and undertakes to put it into a trust for his own benefit beyond the reach of his creditors. Such a trust would take from them what they would have had a right to look to for payment of their debts. It violates not only the general principle that one's property is liable for his debts but also the law of fraudulent conveyances. All the authorities say that one cannot create a spendthrift trust with his own property for his own benefit. Menken v. Brinkley, 94 Tenn. 721, 31 S. W. 92; Citizens Nat. Bank v. Watkins, 126 Tenn. 453, 150 S. W. 96; 1 Bogert on Trusts and Trustees, sec. 224; 1 Scott on Trusts, sec. 156; Restatement of Trusts, sec. 156.

"Such a trust constitutes the maximum in the way of delaying, hindering, and defrauding creditors of the settlor. As to existing creditors, it removes from their reach property which in all equity ought to be applied for their benefit, which in many cases is the produce of the creditors' goods and money. As to future creditors, the spendthrift trust for the settlor seeks to lay a trap, to enable the settlor to enjoy an income which gives him the appearance of having capital without actually having it, to mislead creditors into the extension of credit when there is no basis therefor." 1 Bogert on Trusts and Trustees, sec. 224, p. 731.

"It is immaterial that in creating the trust the settlor did not intend to defraud his creditors. It is immaterial that he was solvent at the time of the creation of the trust. It is against public policy to permit a man to tie

up his own property in such a way that he can still enjoy it but can prevent his creditors from reaching it.'' 1 Scott on Trusts, sec. 156, p. 782.

It is immaterial whether he tries to do this directly or indirectly. Whether he transfers his property directly into the trust, or pays the consideration to another to transfer the property, or pays off an encumbrance on the trust property, or in any other way contributes to it, equity looks through the form, considers the effect of what he has done, and holds the trust invalid to the extent of his contribution. 1 Bogert on Trusts and Trustees, sec. 224, p. 734; Restatement of Trusts, sec. 156, pp. 387 388; 1 Scott on Trusts, sec. 153.3, pp. 785-787; Griswold on Spendthrift Trusts, secs. 487-492.

The effect of what Rogers Caldwell did in this case was to put $350,000 of his money into property to be put into a trust for himself beyond the reach of his creditors, present and prospective. He and his father intended this result and together they brought it to pass. The transaction would not be different in the view of equity if he had put his $350,000 into the property after, rather than before, it was given him in the spendthrift trust. That is, he contributed this amount to the trust property. Under all the authorities the trust is invalid to the extent of this contribution. So we agree with the learned chancellor that the State as a creditor of Rogers Caldwell, without regard to his actual intent, has the right to subject the property to the extent of its enhancement by reason of his contribution.

Defendants, however, contend that even if Rogers Caldwell can be held to have contributed to the trust property, enhanced its value, and to that extent created a spendthrift trust for his own benefit, only his interest in such enhancement, i. e. his life estate in such enhancement,

may be subjected and that the remainder interest of his children, who are not in being but whose birth must be presumed, in the property as enhanced may not be subjected for any debt of his. It is said that, in so far as their interests are concerned, the property, including its enhancement, proceeded from, and the trust was created by, another than themselves, and the trust is valid.

There is authority for the view that where one creates a spendthrift trust making himself the beneficiary for life, with remainder to other persons, their interest under the trust may be attacked by his existing creditors but not by his subsequent creditors. 1 Bogert on Trusts and Trustees, sec. 224, p. 732, and cases there cited; Griswold on Spendthrift Trusts, sec. 475.

But we think the question has been decided the other way by Citizens Nat. Bank v. Watkins, 126 Tenn. 453, 150 S. W. 96. In that case Watkins, who does not appear to have owed any debts, conveyed his land in a spendthrift trust for himself for life with remainder to his daughter. If she survived him the trustee was to convey the land to her as her separate estate when she reached the age of 21. If she died without issue within his lifetime the trustee was to reconvey the property to him. If she survived him and died without issue before reaching the age of 21, the trustee was to convey the property to his two brothers named. The bank, a subsequent simple contract creditor of his, filed a bill charging the trust was a fraudulent conveyance, and seeking to subject the land to its debt. His answer denied the fraud charged. There was no proof of any fraud "other than the deed itself." But the Court held that this was enough, that the conveyance was fraudulent and void, and that the bill be sustained. Speaking through Mr. Justice Lansden, the Court said:

"From the nature of the deed of trust in question we are of opinion that its legal effect amounts to nothing more than a scheme to hinder and delay creditors in the collection of their debts. No other proof of the scheme is required than the terms of the instrument itself. The defendant was already possessed of an estate in the property of his own right, holding the legal title and the beneficial use, and the only benefit which he could acquire by the conveyance to his brother in trust for himself would be to hinder and delay creditors in the collection of their debts. He cannot own the property and not own it at the same time. Whatever might be said of the justice or honesty of the arrangement in point·of morals, it is enough that such conveyance contravenes a sound public policy announced in Menken v. Brinkley, supra, and is therefore void. Being void, it may be reached by the bill in this case, upon an allegation that the conveyance is fraudulent, and was made for the purpose of hindering and delaying creditors, without any further proof of the fraudulent arrangement than the instrument itself. Its inevitable effect it to hinder and delay creditors, and the maker must be conclusively presumed to have so intended." 126 Tenn. at pages 459, 460, 150 S. W. at page 97.

While the Court did not discuss the point, the necessary consequence of its holding the deed void as a fraudulent conveyance was that the remote grantees or remaindermen, being mere donees or volunteers, not having paid any consideration, could not retain any benefits under the deed against the grantor's creditors. See Code, sec. 7279.

The same result was reached in Taylor v. Jones (1743), 26 English Reprint 758. In that case a husband with his property (stock) created a trust for the benefit of himself

for life, for his wife for life, and afterwards for the benefit of their children. It was held that this was void as a fraudulent conveyance and that his creditors could subject the whole of the trust property.

Under these decisions the transfer by Rogers Caldwell of $350,000 of his own money into the trust property was a fraudulent conveyance, without regard to his actual intent, since its inevitable effect was to hinder and delay his creditors, existing and subsequent. Any children of his could only be donees or volunteers and could take no benefits under such transfer as against his creditors. So we think the chancellor did not err against defendants in decreeing that the State had a right to subject the land for the amount by which its value had been enhanced by reason of the improvements.

This brings us to the State's assignment of error, which is that the chancellor should have found that the transaction was fraudulent in fact, and should have held that the State could subject not merely the enhancement but the whole value of the land up to the amount of the $350,-000 used by Rogers Caldwell in making the improvements. It is argued that this use of the money was a transfer by the son to his father with actual intent to hinder, delay, or defraud his present and future creditors; that this intent was known and participated in by the father; and that this entitled the State to subject the land in the father, and now in the trustee, for the $350,000 thus fraudulently conveyed.

It was to this issue of actual intent that the proof was mainly directed. The proof was voluminous, owing to the involved operations of Mr. Caldwell. It was an effort to develop the circumstances under which he paid out the $350,133.80 for the improvements, the position of himself and his companies from that time on till their

failures in November, 1930, the results of their liquidation, his business and personal relations with his father, and many other circumstances more or less related to the issue of actual fraud.

Mr. James ·E. Caldwell was thought to be a man of great wealth. He was president of the Fourth & First National Bank and the dominant force in its affairs for many years till it closed in 1930, following the failures of the companies of his son, Rogers Caldwell. During his active business career he purchased a tract of land on the Franklin Pike for his home, taking the title in trust for his wife, free from his creditors. He also acquired two other tracts of land, one of some 700 acres and the other of 204 acres, herein involved. Both of these tracts were near his home. During the years 1924 and 1925 he gave each of his children except Rogers a home in trust free from the claims of creditors. Each of these deeds was made and recorded during those years.

Rogers Caldwell married in 1913 and lived in the home of his father until 1917 or 1918. He organized Caldwell & Company in 1917 and about that time he moved onto the 204 acres of land, with the understanding between him and his father that his father was going to "trustee" the land to him and any children he might have, free from the claims of his creditors. The business of Caldwell & Company was dealing in bonds of municipal corporations and stocks and bonds of private corporations. Its capital stock was $100,000 all of which was subscribed for by Rogers Caldwell; but none of which he had paid for. In his operation of Caldwell & Company. he constantly required large sums of money, much of which he borrowed from his father's bank, its affiliates, and other banks. ·

In 1919 he organized the Bank of Tennessee under a banking charter to receive deposits. But it was not a

commercial bank. It had no banking house, no fixtures, and no vault. It was operated in the Nashville office of Caldwell & Company, which owned all of its stock. These two companies had the same directors, the same officers, and the same bookkeepers; and the secretary of Caldwell & Company was the auditor of the Bank of Tennessee. This bank was operated solely in the interest of Caldwell & Company. It received deposits from cities, counties, the State of Tennessee, and private corporations sponsored by Caldwell & Company; and loaned this money to Caldwell & Company, its affiliates, and corporations whose securities Caldwell & Company had underwritten and was selling.

Caldwell & Company would buy bond issues of counties and cities issued for public improvements, and would make agreements with the municipalities that the proceeds of the bonds would be deposited with the Bank of Tennessee or Caldwell & Company and drawn out only as needed in the course of the construction. These deposits were secured by depository bonds or by collateral under trust agreements. The sureties on these depository bonds were Rogers Caldwell and employees of Caldwell & Company. Also large deposits were continually being made in the Bank of Tennessee by the State of Tennessee. These deposits were required to be secured by depository bonds, and Rogers Caldwell and employees of Caldwell & Company were sureties on these bonds.

In 1927, when he began the improvements, Rogers Caldwell had no property except his stock in Caldwell & Company. This stock had no market value and its actual value was uncertain, depending upon the future of the company. Its aim was not so much to earn brokerage

as to buy and sell securities at a profit, and it dealt mostly in securities which were not listed and which had no market value. In June, 1927, in addition to his "continuing liability" as surety on these depository bonds, Rogers Caldwell was indebted to Caldwell & Company in the sum of $256,790.80, which was some $53,000 more than the entire surplus and profits of Caldwell & Company at that time, such surplus and profits being $203,669.88, according to the books of Caldwell & Company, as shown by the audit of Price, Waterhouse & Company. Also the joint corporation excise tax reports of Caldwell & Company, the Bank of Tennessee, and Rogers Caldwell & Company, for their fiscal year ending June 30, 1927, showed that the three companies had suffered a loss for that year of $741,809.33.

In June, 1927, the position of the Bank of Tennessee was further imperiled by its making with Caldwell & Company what was called a "general repurchase agreement." This agreement provided that Caldwell & Company might "sell" securities to the Bank of Tennessee "at such prices as may be agreed upon," and on demand would repurchase them at the same prices. Employees of Caldwell & Company represented both parties in making and carrying out this agreement. It is said that this agreement was made at the suggestion of the State Banking Department; but it is not shown who, if anybody, in that Department made such suggestion; and it is difficult to see why a thing so contrary to sound banking practice would have ever been suggested or later allowed to continue. Under this agreement Caldwell & Company could take its securities which had no market value and borrow thereon money from the bank as fast as such money was deposited by the State and others. Mr. Donovan, secretary of Caldwell & Company, admits, and

Mr. Caldwell himself seems not to deny, nor could it well be denied, that from and after the making of this agreement "the solvency of the Bank of Tennessee depended entirely upon the solvency of Caldwell & Company."

The State Banking Department's examiners in their reports from time to time commented upon the dangers to the Bank of Tennessee. Among other things they said that its "business being of a stock and bond nature makes the hazard greater and tends to speculation"; that "unknown values of stocks, bonds, and contracts . . . makes it difficult to determine dangers, if any, which may exist"; and on December 27, 1927, the examiner, commenting on a loan by the Bank to Caldwell & Company of $1,903,866.66, said: "Your examiner is of the opinion that while this bank is owned by Caldwell & Company, a loan to themselves of approximately four times as much as this bank's capital and approximately two and one-half times as much as its capital and surplus is not in keeping with good banking principles nor practice, and the loans should be reduced . . . The business and books too interlocking, unsatisfactory accounts, and unsatisfactory to check." Further comments were that the Bank was operated solely for the benefit of Caldwell & Company; and that the elements of danger to the Bank were the "speculative nature of a large percentage of securities financed by Caldwell & Company with values figured on par basis . . . Loans are largely to Caldwell & Company's interests and secured by stocks and bonds in which Caldwell & Company are interested . . ."

In June, 1927, when Mr. Caldwell started paying out the money for the improvements, he could not have been unaware that the very dangers which threatened the Bank of Tennessee likewise threatened himself personal-

ly. He was continuing surety on the depository bonds for the Bank of Tennessee; and the solvency of both the principal and the surety depended on that of Caldwell & Company, whose failure would carry all of them down and leave him nothing. He knew that Caldwell & Company's business was highly speculative and hazardous; that it was not only playing the stock market—its losses during its fiscal year ending June 30, 1927, from "short sales" amounting to $206,643.88—but was also engaged with others in a vast scheme for acquiring control of several insurance companies, banks, newspapers, and other business enterprises. In February, 1927, Caldwell & Company had guaranteed payment of a note for $11,-250,000 given for purchase of control in the Missouri State Life Insurance Company.

As stated above, Rogers Caldwell was living on his father's 204-acre tract, with the understanding that his father would give him this land in trust free from the claims of his creditors. His father says he had made a will doing this; but the will was revocable, not a matter of record, and known only to the father and son. Likewise their agreement was a secret between them. When the son decided to put the improvements on his father's land and his father agreed for him to do this, both of them understood and intended that such improvements would become the property of the father and would be given back to the son free from his creditors. The son made the improvements during two years from June, 1927 to June, 1929; and he took $350,133.80 of the money of the Bank of Tennessee to pay for making these improvements.

The Bank of Tennessee owned a tract of 216 acres of land adjoining the 204-acre tract which belonged to James E. Caldwell and on which Rogers Caldwell was living.

The Board of Directors of the Bank of Tennessee on June 30, 1927, had a special meeting, over which the Bank's President, Mr. Rogers Caldwell, presided. At this meeting they passed a resolution which concluded as follows:

"Be it further resolved, that Mr. Caldwell be authorized to use Brentwood Hall property, now owned by the Bank of Tennessee, as his personal residence at a rental of $5,000.00 per annum, effective January 1st, 1924.

"There being no further business to be brought before the Board, the meeting was adjourned.

"(Signed)   Rogers Caldwell
"Chairman
"(Signed)   P. B. Diatikar
"Secretary."

The land here referred to as "Brentwood Hall property" was the 216-acre tract which the Bank owned, not the 204-acre tract which belonged to James E. Caldwell anl on which Rogers Caldwell had begun to make the improvements. But on June 14, 1927, sixteen days before the above resolution, a cashier's check of the Bank of Tennessee had been issued for the first payment on the improvements. Similar checks of the Bank were issued to materialmen, contractors, etc., from day to day as the construction progressed until June 24, 1929, when it was completed. The total amount of the Bank's money so paid out for the improvements was $350,133.80.

It does not appear who approved the bills for the improvements or issued the checks to pay them. But it does appear that all the directors, all the officers, the auditor, and all the bookkeepers, and everybody at the Bank except its president, Rogers Caldwell, thought this money was being paid out for improvements on the Bank's

property. That the improvements were not on the Bank's property but on that of James E. Caldwell was a secret known only to Rogers Caldwell and his father; and this fact was kept a secret for three years.

During these three years the payments by the Bank for these improvements were carried on its books as a real estate investment of the Bank. Each of these checks for the improvements was entered on the Bank's records under a "Construction Account, Land in 6th District," which showed that the improvements were an asset of $350,133.80 of the Bank. These improvements continued to be carried for three years as an asset of the Bank on its books, and were so shown in its balance sheets, financial statements, in the monthly reports of the Bank's auditor to the Bank's president, and in the annual audits of Price, Waterhouse & Company during these three years. It was during this time that most of the deposits and depository bonds here involved were made, the dates and amounts of these bonds being as follows: June 14, 1929, $3,000,000; August 12, 1929, $1,000,000; March 15, 1930, $250,000; July 2, 1930, $2,000,000.

In the spring of 1930 Ora Thompson, in the Tax Assessor's office of Davidson County, discovered that those improvements were not on the land of the Bank of Tennessee, as they had been given in for taxation; but on the land of James E. Caldwell. Thompson took up this matter with Mr. Donovan, auditor of the Bank of Tennessee, and after several conversations convinced Donovan that the improvements were not on the property of the Bank but on that of Mr. James E. Caldwell. Whereupon Donovan had the bookkeepers change the $350,133.-80 from the real estate investment of the Bank to a charge of that amount against Caldwell & Company, and

Caldwell & Company charged the same amount on its books as a debt against Rogers Caldwell.

In making this change from a real estate asset of the Bank of Tennessee to a charge against Caldwell & Company, an item of $114,000, the cost of the Bank's 216 acres of land, less certain depreciation and a mortgage indebtedness on the 216 acres, was put with the item of $350,133.80 and the account was consolidated in the amount of $443,470.19 as a debt held by the Bank against Caldwell & Company; and Caldwell & Company charged this same amount as a debt against Rogers Caldwell, and the Bank of Tennessee transferred to him the 216 acres by a deed which was dated back to April 15, 1930, but which, however, was not recorded until August 4, 1930. Though all of this transaction was actually made June 4, 1930, it was dated back to April 15, 1930. This charge of $443,470.19 by Caldwell & Company as a debt against Rogers Caldwell increased his debt to Caldwell & Company to $968,959.22.

The stock market crash came in October or November, 1929. Donovan, secretary of Caldwell & Company and auditor of the Bank of Tennessee, says that Caldwell & Company lost over $2,000,000 that year. His ad valorem tax report for the Bank of Tennessee for the year 1929, sworn to by him February 27, 1930, shows that the Bank then had a deficit of $84,217.59 (Ex. C-1, Vol. III, pp. 135-138). His ad valorem tax report for 1929 for Caldwell & Company, sworn to by him February 27, 1930, shows that Caldwell & Company had a capital stock of $1,000,000 (it having issued a stock dividend in 1929 to Rogers Caldwell increasing its capital stock to $1,000,000) and had a deficit of $725,300.79 (Ex. C-2, Vol. III, pp. 135, 139-141).

Donovan's consolidated balance sheet as of March 31, 1930, for the three companies, Caldwell & Company, Bank of Tennessee, and Rogers Caldwell & Company, Inc., shows that the three companies had a capital stock of $1,000,000 and a surplus of $1,203,022.02. But this balance sheet shows that among the assets were stocks "appreciated by $1,476,520.35" and debts from officers and employees $476,960.24. Most of Caldwell & Company's stocks, however, were unlisted and had no market value, and there would seem no reliable basis for such appreciation. Also of this item of $476,960.24, due from officers and employees, $408,383.71 was what Rogers Caldwell owed Caldwell & Company on March 31, 1930, before the improvements were charged to him June 4, 1930 (Ex. J. to Donovan, p. 18).

So it seems that Caldwell & Company's capital was impaired by $725,309.79 and reduced to less than $275,-000, before the improvements and the 216 acres of land were charged to him, increasing his overdraft with Caldwell & Company to $968,959.22. To get rid of this overdraft and cure this impairment, he had Donovan "write up" certain stocks of Caldwell & Company $2,894,687.73 as of April 15, 1930 (Vol. V, pp. 225-226); and he thereupon had Caldwell & Company declare him a cash "bookkeeping" dividend of $1,200,000, which was credited to his account. It was in this way that he paid for the improvements and the 216 acres, reimbursed the Bank, paid off his overdraft with Caldwell & Company, and left it owing him approximately $200,000 at the time of its failure.

Shortly after June 4, 1930, Caldwell & Company made a trade with Banco Kentucky, a corporation which had been organized in 1929 to buy control of numerous banks in Kentucky and Ohio. Caldwell & Company increased

its capital stock by $1,000,000 and swapped this $1,000,000 of its stock to Banco for 800,000 shares of Banco stock. Both parties traded without even having an audit of the other's books; but Banco did hold ¼, and later required another ¼, of its stock going to Caldwell & Company pending an examination of the latter's affairs. Mr. Caldwell says that this was a very profitable swap and that it added $1,000,000 to Caldwell & Company's liabilities and $20,000,000 to its assets.

But within two or three months both Banco and Caldwell & Company failed. So disastrous was Caldwell & Company's failure that it paid its unsecured creditors only .004129 per cent, or less than ½ of 1% of their debts; and the Bank of Tennessee paid its common creditors nothing. At the time of the failures the Bank of Tennessee showed assets of $13,969,500.50 and liabilities, exclusive of capital stock, surplus and undivided profits, of $13,027,590.07. Included in these assets were securities which had been ''sold'' to the Bank by Caldwell & Company under the repurchase agreement aggregating $12,655,094.61, out of which only $108,831.09 was realized.

As stated above, twelve days after these failures, on November 18, 1930, was recorded the deed of James E. Caldwell and wife conveying this 204 acres of land with the improvements into the spendthrift trust for Rogers Caldwell and any child he might have, free from the claims of his creditors. Shortly thereafter James E. Caldwell and wife conveyed all of his property into other spendthrift trusts for their children, some of such trusts being for Rogers Caldwell and including this 216 acres that came from the Bank of Tennessee; and James E. Caldwell's cross-examination shows that a creditor with a large judgment against him is suing to set aside these trust conveyances of his property.

■ The source of the law of fraudulent conveyances is usually said to be the Statutes of 13 Elizabeth (Ch. 5) and 27 Elizabeth (Ch. 4), which, with slight variation, were early reenacted in this State and are now Code, sec. 7832. This statute is familiar and need not be quoted. It makes fraudulent and void all transfers of property made with intent to hinder, delay, or defraud creditors. Such an intent is an act of the mind manifested by conduct. Whether it was present in a given case was at first treated as a question of fact under these statutes. But decisions in this, as in other fields of the law, had a way of becoming precedents and hardening into presumptions or prima facie rules of law; and much of this large body of case law has now been codified in the Uniform Fraudulent Conveyance Act, Code, secs. 7271-7281.

■■ This Act for the most part furnishes definitions of conveyances fraudulent in law and conveyances presumed to be fraudulent, as distinguished from conveyances fraudulent in fact. By it every conveyance without "a fair consideration" is fraudulent (1) if the conveyor is thereby rendered insolvent, Code, sec. 7274, or (2) if he is engaged or about to engage in a business or transaction for which his remaining property is an unreasonably small capital, Code, sec. 7275, or (3) if he intends or believes that he will incur debts beyond his ability to pay, Code, sec. 7276; number (2) being fraudulent as to creditors and as to persons who become creditors during the continuance of such business transaction, and number (3) being fraudulent as to both present and future creditors. Every conveyance made with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud, either present or future creditors, is fraudulent as to both present and future creditors, Code, sec. 7277.

Sections 7275 and 7276 include, and enact rules of law for, factual situations which, before that Act, Courts had found sufficient to prove actual intent to hinder, delay, or defraud creditors. Where one who is engaged, or is about to engage, in a "hazardous business," makes a voluntary conveyance of the bulk of his property so that if he succeeds he may make a fortune and if he fails he leaves the loss to fall upon his creditors, such conveyance will be held to have been made with intent to hinder, delay, or defraud his creditors. Ex parte Russell, [1882] L. R. 19 Eq. 588, 598; Mackay v. Douglas, [1872] L. R. 14 Eq. 106, 118-123; Churchill v. Wells, 47 Tenn. 364, 369-375; Hartnett v. Doyle, 16 Tenn. App. 302, 313-320, 64 S. W. (2d) 227; 2 Pomeroy's Eq. Jur., 4th Ed., sec. 973; 1 Glenn on Fraudulent Conveyances and Preferences, 1940 Ed., secs. 334, 335. Cf. Nelson v. Vanden, 99 Tenn. 224, 42 S. W. 5.

"Finally, it may be laid down as a doctrine generally accepted, that if a person, being at the time indebted, makes a voluntary conveyance of his property to such an extent that he is left actually insolvent, or wholly unable to pay his existing debts, or that it is reasonable to suppose he contemplated his consequent inability to pay, or even that it is reasonably doubtful whether he is able to meet his obligations, then the conveyance will be fraudulent and void as against his subsequent as well as his existing creditors" 2 Pomeroy's Eq. Jur., 4th Ed., sec. 973.

"When a voluntary settlement is made on the eve of the settlor's engaging in trade, the burden rests upon him of showing that he was in a position to make it. In order to set aside such a settlement, it is not necessary to show that the settlor contemplated becoming actually indebted; it is enough if he contemplated a state of things

418

which might result in insolvency or bankruptcy. The reason for this particular rule is, that the person being about to engage in a hazardous business must be considered as contemplating the probability of becoming unsuccessful and indebted, and as attempting to secure his property against such possible or probable loss; it is in fact an attempt to throw all the hazard of his business upon his expected creditors'' 2 Pomeroy's Eq. Jur., sec. 973, note 3.

We think Mr. Caldwell was engaged in a hazardous business within the meaning of this rule. He had no property except his stock in Caldwell & Company. That company's business was speculative and hazardous. It dealt mostly in securities which had no market values, were highly speculative, and seemed to have been carried on the company's books at such values as he thought they had, or hoped they might have. He was a continuing surety on depository bonds to the State and to others which ran into millions of dollars. His liabilities on such bonds were debts within the meaning of the Fraudulent Conveyance Act, which defines a ''debt'' as any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent, Code, sec. 7271.

Learned counsel insist that the particular bonds here involved were made subsequent to the two-year period (June, 1927, to June, 1929) during which Mr. Caldwell was making these improvements, and that the State can be regarded only as a subsequent creditor. We do not think so. In the first place the depository bonds to the State were being made continually and their obligation was a continuing one. In the next place the rule applicable to subsequent creditors is this: Creditors who contract debts under such circumstances that

knowledge of the previous voluntary transfers must be imputed to them cannot be regarded as hindered, delayed, or defrauded by such transfers. Long v. True, 149 Tenn. 673, 683, 684, 261 S. W. 669. Here such knowledge could not be imputed to the State because (1) the transfer was secret, known only to the transferor and transferee; and (2) it was positively misleading and deceptive, the improvements being actually carried by false entries on the Bank's books as a real estate investment of the Bank. This amounted to obtaining false credit for the improvements on the basis of this deception.

If all the other evidences of actual intent on the part of Rogers Caldwell to hinder, delay, or defraud his creditors be put to one side, and if the case be regarded merely as a voluntary conveyance by him to his father in making the improvements, the burden would be shifted to him to prove not only that he was solvent but also that he was in a position to make the conveyance without injury to his creditors. James v. Joseph, 156 Tenn. 417, 424, 1 S. W. (2d) 1017, and cases there cited; Ga Nun v. Palmer, 216 N. Y. 603, 611, 111 N. E. 223; General Contract Purchase Corporation v. Conner, 23 Tenn. App. 1, 15, 126 S. W. (2d) 347; Mackay v. Douglas, [1872], L. R. 14 Eq. 106, 119. In the case last cited Malins, Vice Chancellor, said:

"Lord Langdale considered the question very fully in Townsend v. Westacott (48 Eng. Reprint 1212, 49 Eng. Reprint 259), where the insolvency did not arise until three years after the voluntary settlement was executed; and he there laid down the rule that the burden of proving the position of the parties, and that they were in a position to make a voluntary settlement, was shifted and thrown upon the man who executed the voluntary settlement. . . . I carried the principle somewhat further

perhaps in Crossley v. Elworthy (L. R. 12 Eq. 158) than the previous decisions, because I did not treat it as turning on the mere question of solvency or insolvency, but I said (L. R. 12 Eq. 168), 'If a man does under such circumstances'—that is, when it is doubtful whether he is in a solvent condition, and, if so, uncertain whether he is likely to remain so—'make a settlement, it seems to me in the highest degree reasonable that upon him should be thrown the burden of proving that he was in a condition to make it when it was executed' " L. R. 14 Eq. 119.

If this burden is upon one who, under these circumstances, makes a voluntary conveyance for another's and not his own benefit, much greater must be the burden upon one who makes such a conveyance for his own ultimate benefit, as Mr. Caldwell did in this case. Indeed, Citizens Nat. Bank v. Watkins, supra, indicates that this burden is altogether too heavy and that such a conveyance must be conclusively presumed to have been intended to hinder and delay one's creditors because that is its inevitable effect. The most frequent offending feature in fraudulent conveyances is the reservation by the conveyor of a secret trust for his own benefit. That is the classic example given in the books of a fraudulent conveyance. The authorities generally hold that such a secret trust or reservation is conclusive evidence of actual intent to hinder, delay, or defraud creditors. Bumpas v. Dotson, 26 Tenn. 310, 317, 46 Am. Dec. 81; Annotation, 68 A. L. R. 306.

But in this case there are a number of other circumstances or "badges of fraud" evidencing an intent to hinder, delay, or defraud creditors. There was the secret agreement between the father and son that the father would give the son this land in a trust beyond the reach of the son's creditors; the son was engaged in a hazardous

business; the money was taken secretly and illegally out of the Bank to make the improvements on the land; this taking was concealed by false records showing the improvements as an asset of the Bank; the secrecy and deception was carried on three years; when it was discovered that the improvements were not on the Bank's land, the improvements and the Bank's land were transferred through Caldwell & Company to Mr. Caldwell; the deed conveying this land was dated back to April 15 but not recorded till August 4, 1930; the securities of Caldwell & Company were written up nearly $3,000,000 to pay for the improvements and the Bank's land and to clear Mr. Caldwell's enormous overdraft with his company; and the deed of the father giving the son the land in a spendthrift trust free from the son's creditors seems to have been made a few days before, but was not recorded until a few days after, the failures of Mr. Caldwell's companies.

These badges of fraud called for explanation and put upon him the burden not only of showing he was solvent and in position to transfer the $350,133.80 without injury to his creditors but also of showing the entire good faith of the transaction. We think he has failed to carry this burden. Some of these circumstances are not explained at all, and some of his explanations of the others are unconvincing. For instance, during all the time he was taking this large sum from the Bank to make the improvements, he actually did not know, he said, where the money was coming from, but supposed it was from Caldwell & Company. While the learned chancellor appears to have accredited this statement, we cannot. It seems altogether incredible that for three years he did not see any of the balance sheets of the Bank, or any of the auditor's special reports addressed

to him as president, or any of the annual audits of Price, Waterhouse & Company, all of which showed that the $350,133.80 was being paid out of the Bank's funds and was being carried as a real estate investment and asset of the Bank. We think all of the circumstances establish that he made the transfer with intent to hinder, delay, or defraud his existing and subsequent creditors.

We also think the proof shows that the father knew and participated in this intent. The father and son were in intimate personal and business relations. The son lived on the father's land near the father's home and the son's place of business was immediately across the street from the father's bank. The son was a director in five of the father's companies and the son's companies actually listed the father's bank as one of the "controlled companies." The father participated with the son in buying control of the Missouri State Life Insurance Company, in organizing the Bank Securities Corporation to control several banks, and in many other speculations. These and the other circumstances shown warrant the conclusion that the father knew and participated in the son's intent to hinder, delay, or defraud his creditors. Bump on Fraudulent Conveyances, 3d Ed., pp. 202-203.

Ordinarily a grantee in a fraudulent conveyance is liable only to return the property. But where he participates in the fraud he is not entitled to look to the conveyance for security or reimbursement. Alley v. Connell, 40 Tenn. 578, 582; Sands v. Codwise, 4 Johns. (N. Y.) 536, 4 Am. Dec. 305; Shepherd v. Woodfolk, 78 Tenn. 593. Where he has disposed of the property, converted it so it cannot be returned, or otherwise helped to put it beyond the reach of the creditors he is personally liable for the value of the property. This rule has been applied in numerous cases involving personal property. Slaughter

v. Cooper Corporation No. 2, 20 Tenn. App. 241, 244, 97 S. W. (2d) 648, and cases there cited; Lazell v. Powell, 1 Shannon Cas. 132, 140. In the latter case Judge Caruthers, speaking for the Court, said:

"The correct doctrine must be in all such cases, where there is actual fraud, that the defrauded creditors are entitled to the full value of their debtor's property thus fraudulently conveyed, without regard to the loss that may fall upon those who have conspired to defeat them. This will also operate as a just punishment for the guilty, and deter men from participating in the perpetration of frauds upon honest creditors. If they are to be fully reimbursed upon detection in their fraud, there would be no restraint upon them. The heavier the loss upon them, the better will be the effect as an example, and the more the law will be exalted in the estimation of all good men. It would be but a mockery to allow men to enter into these fraudulent arrangements, and enjoy the chances of success, and when detected, saved from all loss by full reimbursement. This is not the policy of the law, nor is it law at all, in cases of actual fraud." (1 Shannon Cas. at page 140.)

The $350,000 which the son transferred into the father's land by making the improvements thereon cannot be severed or returned to the son's creditors. But the land, while in the father, could have been subjected by such creditors to a lien for that amount. Now that it is in a spendthrift trust for the son's benefit, it is no less liable to be so subjected. So we think the State is entitled to a lien on the land for the $350,133.80 and entitled to a sale of the land, if necessary, to enforce this lien.

The decree of the chancellor will be modified so as to give the State a lien on the land for $350,133.80 and, as

modified, will be affirmed. The defendants will pay the costs of the appeal. The cause will be remanded to the chancery court for the enforcement of the lien as above indicated.

Howell and Hickerson, JJ., concur.