642

## JAMES A. HAMILTON, JR. v. RICHARD GLEAVES et al. —316 S. W. (2d) 335.

Middle Section.   April 25, 1958.

Certiorari denied by Supreme Court September 1, 1958.

Waller, Davis & Lansden, Nashville, for complainant.

Olin White, Nashville, for Amusement Facilities, Inc., and McDowell & McDowell.

Earl McNabb and Richard Gleaves, Nashville, for American Legion Amusement, Inc.

Ferriss Bailey, Nashville, for Stansell Electric Co.

J. G. Lackey, Jr., Nashville, for Marietta Concrete Corp. of Tennessee.

I

SHRIVER, J. This cause was originally begun by bill of James A. Hamilton, Jr., filed on June 22, 1955, against seven defendants as follows: (1) Richard Gleaves, (2) American Legion Amusements, Inc., (3) Post 5 American Legion, (4) Amusement Facilities, Inc., (5) Robert McDowell and Roscoe McDowell, doing business as McDowell & McDowell, (6) Stansell Electric Company, Inc., and (7) Marietta Concrete Corporation of Tennessee.

Complainant sought to recover for alleged services rendered by him in the early part of 1950, pursuant to a contract with American Legion Amusements, Inc., in surveying and doing other work in connection with the building of a race track to be known as the American Legion Bowl.

The case was heard before Chancellor Thos. W. Steele, on the original bill, the answers of defendants and oral proof introduced in court and resulted in a dismissal of the suit as to six of the defendants and the rendering of judgment against one defendant, American Legion Amusements, Inc., for $1,659 and interest from the date of the filing of the bill.

Complainant filed a petition to re-hear which was overruled but, thereafter, was given leave to file a supplemental bill in the same cause. Said supplemental bill was limited to two of the original defendants, to wit; American Legion Amusements, Inc., and Amusement Facilities, Inc.

The cause was then heard before Chancellor Ned Lentz, on the supplemental bill and answers thereto, together with a transcript of the proof at the prior hearing, which was introduced pursuant to stipulation, and additional oral proof of one witness, from all of which the Chancellor was of the opinion that the complainant was not entitled to the relief sought by the supplemental bill and same was, thereupon, dismissed.

The appeal herein is only as to the action of Chancellor Lentz in denying relief and dismissing the supplemental bill.

The case involves the transfer of certain assets by American Legion Amusements, Inc., to Amusement Facilities, Inc., which transfer was alleged in the original and supplemental bills to have been fraudulent as to complainant, a creditor of American Legion Amusements, Inc.

The supplemental bill prays, among other things, for an attachment of the property in question and a sale thereof to satisfy his claim; and said conveyance to the defendant, Amusement Facilities, Inc., be decreed to be fraudulent, null and void against complainant; that, in the alternative, a receiver be appointed to take possession of the American Legion Bowl race track and improvements and all the assets conveyed by the defendant, American Legion Amusements, Inc., and to collect income therefrom pending the litigation, and for a sale of said assets, if necessary and for general relief.

## II

### The Facts

Post 5, of the American Legion of Nashville, Tennessee, desired to organize and build a quarter mile race track, and, to this end, there was organized a general welfare corporation known as American Legion Amusements, Inc.

In June 1950 this welfare corporation entered into an agreement with the original defendants to build said quarter mile track on the property of W. G. Bush & Co. in East Nashville. These defendants will be referred to as the Builders, hereinafter.

The Builders agreed to and did build this track for which they were to be paid from a percentage of the gate receipts. It was agreed that they were to receive 10% of the gate receipts and an additional 10% of said receipts was to be put in escrow as security to the Builders to enable them to recover their costs.

If the Builders received the actual amount expended by them from the 10% allotted to them then the amount in escrow was to revert to American Legion Amusements, Inc. However, if the Builders did not receive their costs therefrom, then the money in escrow was to be turned over to them as a credit on payment for the work done.

The record shows that the Builders spent approximately $50,000 in making the improvements, which amount did not include any profit to them.

American Legion Amusements, Inc., employed the complainant, James A. Hamilton, Jr., to make certain

surveys and to design the track they contemplated building. This contract with the complainant was made prior to the contract with the Builders.

Complainant testified that he had never, at any time, discussed his employment with any of the Builders and that they did not employ him to do any thing.

It is to be noted that, although the complainant claims to have done his work in the early part of 1950, he took no action to recover on same until June 22, 1955.

It appears that American Legion Amusements, Inc., was not successful in operating the track and that a general creditors bill was filed against it on December 2, 1952. In the mean time, the Builders had recovered a small part of their actual costs, and, apparently, faced a loss of many thousands of dollars.

It is to be noted that the record does not disclose that the complainant filed any claim or took any part in the proceedings on the general creditors bill.

At the time in question there was in the escrow account the sum of $13,240.19 and, in addition thereto, there was a Cashier's check for $770, making a total of $14,010.19 in escrow under the provisions hereinabove mentioned.

It seems that, under the terms of the agreement between the Builders and the Corporation, this sum of money held in escrow, belonged to the Builders because of the default on the part of American Legion Amusements, Inc., in the rent due W. G. Bush & Co., and the lease was subject to termination at any time by the owner. It is pointed out by counsel for the defendants that, at this point, the Builders could have kept the $14,-010.19 and, doubtless, could have negotiated a lease with

W. G. Bush & Co., for the property. However, in an effort to help the American Legion and the project which it had initiated, they had a number of conferences with officials of the corporation and of the legion and their attorneys, the result of which was a written agreement entered into on Feb. 12, 1953, between American Legion Amusements, Inc., and the Builders. Under the terms of this agreement, the Builders agreed to transfer and release to American Legion Amusements, Inc., the escrow funds and the Cashier's check totaling $14,010.19 in consideration of which American Legion Amusements, Inc., promised to do two things, to wit; (1) to pay and discharge all debts of American Legion Amusements, Inc., except the debts due to the Builders themselves. This was in order to free the race track and personal property of the claims of creditors, and (2) to transfer to a corporation to be formed by the Builders, the lease on the race track premises and the small amount of miscellaneous personal property that the corporation owned.

The terms of this agreement of Feb. 12, 1953, were carried out. The $14,010.19 was turned over to the American Legion Amusements, Inc., and the lease on the premises and the personal property were transferred to a corporation organized by the Builders known as Amusement Facilities, Inc.

There was a collateral agreement made by the Post 5 of the American Legion to guarantee the payment of all the debts of American Legion Amusements, Inc., except the claim of the complainant which the Legion declined to guarantee.

All the other debts were paid except that of complainant and after several years he filed suit as hereinabove outlined.

The agreement of Feb. 12, 1953, is to be found on page 21 et seq. of the record.

Section 2 of this agreement states:

"It is the intent and purpose of the parties of the second part (the builders) by the execution of this agreement to free said race track and said miscellaneous items of personal property of the claims of creditors so as to enable said party of the first part (American Legion Amusements, Inc.,) to execute a good and valid bill of sale on said property as well as the assignment of said lease * * *." (The words in parenthesis added.)

Paragraph 3 of the said agreement is as follows:

"Said party of the first part convenants and warrants that all debts that it owes to creditors, other than the parties of the second part, can be satisfied and discharged in full from the proceeds of the aforementioned escrow account and said cashier's check."

## III

### Assignments of Error

There are four assignments of error which are as follows:

"1. The Chancellor's decree dismissing complainant's supplemental bill is erroneous because there is no material evidence to support the decree

and the undisputed evidence showed that the conveyance which the supplemental bill sought to have set aside was fraudulent as to complainant and that complainant was entitled to have the assets conveyed applied to the satisfaction of his claim.

"2. The Chancellor's decree dismissing complainant's supplemental bill is erroneous because the evidence preponderates against the decree.

"3. The Chancellor erred in finding that the conveyance between the defendants was made for a valuable consideration and was not a fraudulent conveyance.

"4. The Chancellor erred in failing to find that the property conveyed by defendant American Legion Amusements, Inc., was liable for complainant's claim and was impressed with a trust in favor of complainant and in failing to hold that complainant was entitled to have said property applied to the satisfaction of his claim."

## IV

It is insisted by the complainant that he performed the work for American Legion Amusements, Inc., in 1950 and is entitled to payment of $1,659 from the assets in the hands of said corporation on the date of the transfer of same to Amusement Facilities, Inc.

Complainant in his brief makes two principal contentions. First, that the conveyance to Amusement Facilities, Inc., was a fraud on creditors; and, second, that the lease and personal property of American Legion Amusements, Inc., constituted a trust fund for all of its creditors, which trust fund was diverted.

In the reply brief of defendants it is said that the contention on the part of complainant that the conveyance was a fraud on creditors is based on two erroneous conclusions which are repeated time and again by the complainant throughout his brief. The first of these errors is the conclusion that there was no fair consideration paid to American Legion Amusements, Inc., and the second is that the Builders made an agreement with the American Legion Amusements, Inc., that all creditors would be paid, except Hamilton. These two conclusions are discussed separately.

As is seen hereinabove American Legion Amusements, Inc., had invested virtually nothing in the construction and operation of the track. The Builders had spent close to $50,000, and by January of 1953, had recovered only a small part of their costs. At this time there was in escrow $14,010.19, which, under the terms of the agreement of the Builders with the corporation, belonged to the Builders, and, under its terms, the Builders had the right to take over the race track and facilities and a letter had already been written to American Legion Amusements, Inc., notifying it that the Builders were exercising their right to take over the track. At this time the corporation owned virtually nothing. The lease provided that it could be terminated on default in. payment of rents. And, under the terms of the lease, all rights in the improvements were forfeited to the lessor in the event of bankruptcy or receivership. A general creditor's bill had been filed and it seemed evident that, in January 1953, the lease and improvements on the property were of no immediate value to American Legion Amusements, Inc. The said corporation was without money with which to pay the deficiency in rent and its other creditors.

The record shows that the only assets of any value owned by said corporation at this time consisted of a few miscellaneous items of personal property used about the track, which were not worth in excess of a few hundred dollars.

Under these circumstances the agreement of February 12, 1953, was entered into. This agreement appears to have been advantageous to the corporation and amounted to a considerable concession on the part of the Builders made in order to avoid embarrassment to Post 5 of the American Legion which had sponsored the corporation.

The result seems to be that the Builders purchased from American Legion Amusements, Inc., its remaining assets in the form of the lease and personal property, for the sum of $14,010.19. Instead of being an inadequate and unfair consideration, as the complainant contends, it appears that this purchase price was more than the reasonable value of the assets to be transferred to the Builders' corporation.

It is to be observed also that, in said agreement, the corporation agreed to use the money it received from the escrow arrangement and the Cashier's check to *pay all creditors* other than the Builders themselves, so as to clear the lease, the track, and the personal property of all liens or claims of creditors.

The complainant argues that the value of the lease and the personal property transferred to the Builders' corporation was in excess in value of the money paid therefor because the Builders took over the valuable lease and were able to negotiate a sub-lease shortly thereafter for a considerable amount.

Again, it must be pointed out that the lease and improvements were of no value to American Legion Amusements, Inc., because of the conditions that then existed with reference to the past due rent and the debts of the corporation. On the other hand, the Builders, because of their credit, were able to negotiate an extension of the lease, and it appears that, at the time of the trial below, after four annual seasons of operation, they had still not recovered their initial costs from the operation of the track.

While American Legion Amusements, Inc., was still a going concern at the time of the transfer it is admitted that it was insolvent. However, both of the Chancellors who heard this case in the two trials below found as a fact that there was a valuable consideration for the transfer in question, and that it was made without intent to hinder, delay or defraud complainant or any other creditor, and that it was not a fraudulent transfer.

With these conclusions of fact on the part of the Chancellors we concur.

## V

It was stated in Commerce Union Bank v. Sharber, 20 Tenn. App. 451, 100 S. W. (2d) 243, 247:

"There is evidence tending to show that the effect of the deed here in question was to render J. W. Sharber insolvent within the Code definition of 'insolvency' (section 7272); but the entire adequacy of the consideration stated in said deed is not challenged by pleading or evidence, * * *.

"Section 7274 of the Code, supra, is applicable only to conveyances made 'without a fair consideration'; and, in the instant case, the burden was on the complainants to show the absence of a 'fair consideration.' "

██ In the case of Hicks v. Whiting, 149 Tenn. 411, 258 S.W. 784, 794, there was a conveyance of all the assets of an insolvent corporation in an effort to obtain money to pay the corporation's debts. While there was a fair and adequate consideration for the transfer, it was attacked as being a fraud on creditors, because all of the assets of the corporation were disposed of and because it was insolvent at the time of the transfer. The Court held that the fact that the conveyance was upon a fair and adequate consideration prevented it from being fraudulent, and that the creditors, thereafter, had the right to look to the proceeds of the sale for the payment of their debts. In the opinion in said case the Court stated, in part, as follows:

"* * * The full consideration which the flooring company received from the Boone Pork Manufacturing Company went to pay its creditors, and no officer or stockholder of said company received any advantage or profit. The fact that it conveyed all of its property in an effort to settle its debts, and for a consideration in excess of the reasonable value of same, is no evidence of fraud.

"In 12 R. C. L., 485, it is said: 'The fact that a transfer is of all the debtor's property does not necessarily render its fraudulent. If the conveyance be for the purpose of paying the debts, the fact that

it is of all the debtor's property is evidence of good rather than bad faith.'

"The rule is well established that a corporation may dispose of all of its assets and property by sale or transfer for a fair consideration. The consideration received takes the place of the assets and the properties sold, and the creditors and stockholders of the corporation must look to it for the satisfaction of their interests. This statement assumes that the sale or transfer is made with the approval and consent of the stockholders. There is no prohibition of a corporate sale or transfer for valuable consideration of all of the assets and property as against general creditors."

Thus, we conclude that the conveyance to Amusement Facilities, Inc. being for a fair and adequate consideration, was not fraudulent as to complainant by reason of the insolvency, at the time, of American Legion Amusements, Inc.

## VI

The conveyance not being a fraud on creditors by a reason of insolvency of the vendor, there remains the charge that the transfer was fraudulent under T. C. A. sec. 64-301 or T. C. A. sec. 64-315 because there was an actual fraudulent intent in connection with complainant's claim.

As pointed out hereinabove, the agreement which complainant insists was to the effect that all creditors except Hamilton would be paid out of the proceeds of the sale, seems to be unjustified by the facts.

It is true that there was a collateral agreement on the part of Post 5 of the American Legion by which it guaranteed the payment of all the debts except that of complainant, but the agreement with the Corporation was that *all* debts would be paid out of the proceeds, and we find nothing in the record that would justify the conclusion that the builders had any part in the result that obtained when the other creditors, except the complainant, were paid.

Complainant has argued the significance of the fact that the list of debts of American Legion Amusements, Inc., which is made an exhibit, did not include that of the complainant. However, this list was not attached to the contract between the Builders and the corporation and the record does not show that it was before the parties at the time the agreement was made on Feb. 12, 1953.

It is to be observed, also, that, while $14,010.19 was turned over to the corporation, the indebtedness on the list referred to is $13,260.05, leaving approximately $750 which is not accounted for and, in so far as the record goes, is still available for payment on complainant's debt.

Complainant we think has not carried the burden of proving a fraudulent intent on the part of the defendants.

Defendants insist that complainant has not shown that he was in any way prejudiced by the transfer of the property in question.

█ It is a rule well recognized that in order for a creditor to set aside a conveyance as fraudulent, he must show that he has been prejudiced by the conveyance.

This rule was stated in Marsh v. Galbraith, 31 Tenn. App. 482, 216 S. W. (2d) 968, 970, where the Court used the following language:

"The rule is that in order that a conveyance or transfer may be attacked as fraudulent and void as against creditors, it is necessary that prejudice to their rights has resulted. 37 C. J. S. Fraudulent Conveyances sec. 61, p. 905. It is necessary that the creditor show that the transfer under attack deprived him of the right to subject the property transferred to the payment of his debt. This, we think, complainant failed to show and the bill was properly dismissed."

It is pointed out by defendants that, at the time of the agreement in Feb. 1953, a general creditors' bill was pending against American Legion Amusements, Inc., and the lease was subject to forfeiture. With the loss of the lease also the loss of the improvements upon the property would have taken place. The Builders were entitled to the escrow fund and, undoubtedly, would have taken that. The only assets that would have been available for distribution among other creditors, such as complainant, was an inconsequential amount, and it seems obvious from the record that complainant would have received only a token payment, if anything at all, under the circumstances.

It is suggested that if Hamilton had been diligent and pressed his claim at the time or instituted suit, he, undoubtedly, would have been paid, whereas, he did nothing toward pressing his claim, and, therefore, is left to pursue his remedy against whatever assets are left in the hands of the corporation.

## VII

■■ But it is further insisted by the complainant that the trust fund doctrine applies and that these assets were in the form of a trust fund for the benefit of him and the other creditors.

The cases cited by complainant do not appear to apply to the case at bar, because they do not involve the sale of assets of a 'corporation for a fair consideration.

Marr v. Bank of West Tennessee, 44 Tenn. 471, deals with creditors and assets of a bank and the rights of certain creditors who claimed priority because of judgments obtained. Swepston v. Exchange & Deposit Bank, 77 Tenn. 713, involves a bank and a conveyance to stockholders or officers of the corporation while the case of Vance & Kirby v. McNabb Coal & Coke Co., 92 Tenn. 47, 20 S. W. 424, involves a conveyance without consideration, and for the obvious purpose of evading creditors. Some of the other cases involve deeds of trust executed to secure certain creditors to the exclusion of others.

In Hicks v. Whiting, supra (149 Tenn. 411, at page 453, 258 S. W. 784, at page 797), the trust fund doctrine was discussed and the Court, quoting from the U. S. Supreme Court, stated:

"The trust fund doctrine is defined in Fogg v. Blair, 133 U. S. 534, 10 S. Ct. 338, 33 L. Ed. 721. There it is said: 'That doctrine only means that the property must first be appropriated to the payment of the debts of the company before any portion of it can be distributed to the stockholders; it does not mean that the property is so affected by the indebtedness of the company that it cannot be sold,

transferred, or mortgaged to bona fide purchasers for a valuable consideration, except subject to the liability of being appropriated to pay that indebtedness. Such a doctrine has no existence.'

\* \* \* \* \* \*

" 'A party may deal with a corporation in respect to its property in the same manner as with an individual owner, and with no greater danger of being held to have received into his possession property burdened with a trust or lien.'

\* \* \* \* \* \*

" 'In case of an absolute sale of all the property of an embarrassed corporation, the purchase price, with respect to creditors, will stand as a substitute for the property conveyed, and the creditors' rights may be enforced against that price.'—citing First National Bank [of Tullahoma] v. North Alabama, L. & M. Co., 91 Tenn. 12, 18 S. W. 400.''

In Davis v. Hemming, 101 Conn. 713, 127 A. 514, 517, reported in 39 A. L. R. 133, a clear statement as to the trust fund doctrine was made as follows:

''There are statements in cases to the effect that the assets of a corporation are a trust fund for the benefit of corporation creditors, which seem to convey the idea that upon that fund a lien exists which continues against bona fide purchasers of such assets for a valuable consideration. The law is otherwise.

''\* \* \* 'It is very plain that, in the absence of a statutory provision on the subject, the acquisition of all the stock, property, and assets of a corporation,

by an individual or by another corporation, does not of itself make a new holder liable to pay the debts of the corporation. A mere purchase of such capital stock and assets is a taking of a title which leaves unsecured creditors with no claim against the purchaser.' * * *''

To the same effect is the rule laid down in 13 Am. Jur. 1125, sec. 1238.

## VIII

As is pointed out by learned counsel for defendants, there have been two hearings of this case before two Chancellors. On the first hearing, Chancellor Steele held that none of the numerous defendants were obligated to Hamilton except American Legion Amusements, Inc. On the hearing on the supplemental bill, Chancellor Lentz held that the conveyance was in no way fraudulent as to Hamilton, under the Common Law, Fraudulent Conveyance Statutes or the Trust Fund Doctrine, stating in his decree, ''From all of which the Court is of opinion and finds that the conveyance between the defendants was made for a valuable consideration and was not a fraudulent conveyance either in law or fact.'' We concur in these conclusions.

It results that the assignments of error are overruled and the judgment of the Chancery Court is affirmed.

Affirmed.

Felts and Hickerson, JJ., concur.