In re **KNOX KREATIONS, INCORPORATED, Bankrupt.**

**H. David CATE, Trustee, Plaintiff-Appellee,**

v.

**Hugh P. NICELY, Defendant-Appellant.**

No. 3–77–748.

United States District Court, E. D. Tennessee, N. D.

May 1, 1979.

---

John Walker, Jr., Knoxville, Tenn., for Bankrupt.

Ted H. Lowe, Knoxville, Tenn., for H. David Cate, Trustee.

R. Tom Stinnett, Knoxville, Tenn., for Hugh P. Nicely.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

This action is an appeal from a decision of the Bankruptcy Judge that defendant's security interest in assets of the bankrupt is null and void against the Trustee, that certain transfers of funds from bankrupt to defendant must be returned to the estate and that defendant's claim against the bankrupt be subordinated to the payments of the claims of other creditors. The Bankruptcy Judge specifically found that transfers of property from the bankrupt to defendant on September 11, 1975, December 30, 1976, and August 19, 1977, were fraudulent transfers.

### Background

On September 11, 1975, defendant was President of Knox Kreations, Inc., the bankrupt, and its sole stockholder. At that time, defendant sold 81% of his stock, along with some personally owned real property, to Topsy Turvy, Inc., for a total purchase price of $225,000.00. Topsy Turvy paid $25,000.00 and, in addition, gave defendant a $200,000.00 note, payable in twelve annual installments beginning in January, 1977. As security for the note, the bankrupt was to become an accommodation endorser, the defendant was to take a security interest in the non-cash assets of the bankrupt and 5% of the total monthly sales of the bankrupt

was to be deposited in an escrow account. Security agreements and escrow agreements were duly executed on September 11, 1975. There were other guarantors of the note besides the bankrupt. The escrow agreement itself was signed only by defendant and Topsy Turvy. Following the sale, defendant, still holding the office of president, paid valid debts on behalf of the bankrupt amounting to $43,726.91, including $29,526.91 to himself in repayment of an earlier loan to the bankrupt.[1] The payments reduced by more than half bankrupt's cash balance.

Defendant continued to serve as president of bankrupt until October 12, 1975, when he was replaced by Dr. Clark, who was also president of Topsy Turvy. In January, 1976, defendant again assumed management of the bankrupt for a short time. After February 13, 1976, defendant no longer held any managerial position with bankrupt, except to the extent mandated by his status as minority shareholder.

On January 13, 1976, defendant filed suit in Chancery Court against Topsy Turvy and Dr. Clark on the grounds that the September 11, 1975 agreements had been violated and that they had caused the bankrupt to become insolvent. On December 30, 1976, defendant was paid $36,196.90 from the escrow funds on deposit. On July 15, 1977, defendant filed a second suit against Topsy Turvy, the bankrupt, Dr. Clark and others, again alleging that the September 11, 1975 agreements had been violated and that the bankrupt was unable to meet its obligations. The parties reached a partial agreement, pursuant to which, on August 19, 1977, defendant was paid $12,000.00 from the escrow account. Knox Kreations filed a petition in bankruptcy on December 16, 1977. On December 30, 1977, Topsy Turvy also filed a petition in bankruptcy. Defendant filed a proof of claim for $201,007.15 against Knox Kreations. The Trustee presently has on hand about $55,000.00 claimed by defendant under the September 11, 1975 security agreement.

---

1. There is no allegation in this record that any of these payments were in any way fraudulent.

*The September 11, 1975 Agreements*

Before the Bankruptcy Judge, the Trustee sought to set aside the September 1975 agreements on the ground of violations of state law. The Trustee relied upon § 70(e) of the Bankruptcy Act, 11 U.S.C. § 110(e), which provides in part as follows:

"(1) A transfer made or suffered or obligation incurred by a debtor adjudged a bankrupt under this title which, under any Federal or State law applicable thereto, is fraudulent as against or voidable for any other reason by any creditor of the debtor, having a claim provable under this title, shall be null and void as against the trustee of such debtor."

The parties agree that in order for this section to apply as against the September 1975 agreements, there must exist at least one creditor "having a claim provable under the [Bankruptcy] Act" who would have standing to attack the agreements under state law. The Bankruptcy Judge found that there were two such creditors, Anthony L. Birch and Quality Machine and Welding Company.[2]

▮▮ The Court is of the view that neither of these parties is sufficient to allow the Trustee to invoke Section 70(e). The Bankruptcy Judge found that the September 11, 1975 agreements constituted constructive fraud under state law. In order for a creditor to set aside a conveyance as fraudulent, however, the creditor must show that he was prejudiced by the conveyance. *Hamilton v. Gleaves*, 44 Tenn.App. 642, 316 S.W.2d 335, 341 (1958). In order to show such prejudice, it is necessary that the conveyor not retain other property sufficient to satisfy the debt. *See Hays v. Sound Timber Co.*, 261 F. 571 (9th Cir. 1919). As discussed infra, this Court is of the view that the transfer did not render the bankrupt insolvent. Thus, no prejudice

could have resulted to these creditors. Aside from the issue of technical insolvency the bankrupt owed these two creditors at most $419.65. While the Bankruptcy Judge did not discuss the issue of prejudice, it is undisputed that for at least two years after the 1975 agreements, the bankrupt had sufficient assets to pay these relatively small claims. The only reason these debts were not paid is that they were not timely pressed.

In the case of Mr. Birch, an attorney, the debt arose out of an inquiry into the patentability of a game during 1975. When a bill was ultimately rendered in August, 1976, a legitimate dispute arose concerning whether the defendant personally or the bankrupt owed the debt. The record shows that Mr. Birch simply dropped the matter at that point as not worth pursuing.

In regard to Quality Machine, the work upon which the debt was allegedly based was done in January 1973. A bill was not presented until after August 18, 1976, clearly rendering the debt stale. Furthermore, the debt was disputed. Defendant claimed from the beginning that a third party owed this debt rather than the bankrupt. The long interlude suggests acquiescence by Quality Machine in defendant's interpretation.[3] Even as late as 1976, however, assets remained on hand from which to satisfy the debt, thus undermining any claim of real prejudice from the September, 1975 agreements.

▮ The Bankruptcy Judge also held that the 1975 agreements, and specifically the security interest granted by the bankrupt in favor of the defendant, constituted a fraudulent conveyance under Tenn.Code Ann. §§ 64–312–314. These sections provide as follows:

"Every conveyance made and every obligation incurred by a person who is or

---

2. The Trustee also claimed Master Sandblasters as such a party, but the Bankruptcy Judge held that its debt was stale and therefore not "provable." This finding is not challenged here.

3. The former owner of Quality Machine, Mr. Roth, died in 1976. Its assets and receivables were sold on August 18, 1976. The new owners presented this bill. The failure of Mr. Roth to present a bill in over three years suggests, as claimed by defendant, that he felt the bankrupt did not owe the debt and strongly supports defendant's claim of laches as barring the debt.

will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration." (§ 64–312.)

"Every conveyance made without fair consideration, when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands, after the conveyance, is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business transaction without regard to his actual interest." (§ 64–313)

"Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors." (§ 64–314)

The Court fully acknowledges the deference to be accorded to the findings of fact by the Bankruptcy Judge. See Rules Bankr.Proc. 810. However, the determination of the application of these provisions to this case is a mixed question of law and fact which this Court cannot approve without an independent determination of the law. See In re Werth, 443 F.Supp. 738 (D.Kan. 1977).

The commercial setting of the September, 1975 agreements must be considered in evaluating their allegedly fraudulent character. An important part of the defendant's security for the $200,000.00 note given to him was the continuing financial health of the bankrupt. Obviously, defendant had no incentive to enter into a transaction that would result in the insolvency of the bankrupt. Topsy Turvy was purchasing the bankrupt. Even if it is assumed that Topsy Turvy intended to loot the bankrupt after

the purchase, it still could have benefitted only from purchasing a healthy corporation. Thus, neither party would have had any reason to enter into a transaction harmful to the bankrupt. Admittedly, the Bankruptcy Judge did not find an intent to defraud, but rather found constructive fraud. Nevertheless, the interest of the parties in a healthy corporation must be considered in deciding whether the September, 1975 transaction was likely to lead to insolvency.[4]

■ In applying section 312, the Bankruptcy Judge found that the agreements in September, 1975, rendered the bankrupt insolvent. Section 312 would not be applicable unless the bankrupt were rendered insolvent at the time of, or immediately after, the transfers. See Hyde Properties v. McCoy, 507 F.2d 301, 306 (6th Cir. 1974). In finding insolvency, the Bankruptcy Judge relied upon a strict balance sheet analysis. This approach neglects the flexible approach utilized in Tennessee. See State v. Caldwell, 21 Tenn.App. 396, 111 S.W.2d 377 (1937). Tenn.Code Ann. § 64–309 provides:

"A person is insolvent when the present fair value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured."

The surest sign of the insolvency of a corporation is the worthlessness of its stock. See Hyde Properties v. McCoy, 507 F.2d at 307. It is, therefore, critical to note that Topsy Turvy, an arms length purchaser, was willing to pay $175,000.00 for 81% of the stock of the debtor. Topsy Turvy must have felt that the assets of the bankrupt were greater than its liabilities.

■ Even the balance sheet analysis does not show insolvency. The inclusion by the Bankruptcy Judge of the $200,000.00 guarantee of defendant's note as a liability was not proper. Section 309 requires considera-

---

4. In order to characterize grants of a security interest and a guarantee to the defendant from the bankrupt as fraudulent, it is necessary first that there not be "fair consideration" from the transferees. In the case sub judice, there was consideration for the transfers. The consideration ran from Topsy Turvy to defendant. It is true that the bankrupt did not itself receive separate consideration, but it does not seem fair to distinguish so strictly between a corporation and its sole stockholders in a case such as this. Because the Court finds that the transfers were not fraudulent for other reasons, it is not necessary to decide this issue.

tion only of a party's "probable liability on . . . existing debts as they become absolute and mature." It was by no means "probable" that the bankrupt would become liable for the entire $200,000.00, or indeed any part of it. The primary obligation on the note belonged to Topsy Turvy and it was no doubt anticipated by the parties that the ongoing business would generate sufficient revenue to enable Topsy Turvy to pay the debt.

■ It is true by January, 1976, the bankrupt was experiencing severe financial difficulty. This difficulty was obviously unrelated to the pledge of assets by the bankrupt in September, 1975. In January, 1976, no money had yet been paid to the defendant under the guarantee. Since the bankrupt was not rendered insolvent by the conveyance, Section 312 cannot be relied upon to void defendant's security interest.

■ In regard to Sections 313 and 314, the Bankruptcy Judge found that the property remaining in the hands of the bankrupt was an unreasonably small capital and that defendant had reason to believe that the bankrupt would incur debts beyond its ability to pay. These provisions are normally, if not to say exclusively, applied in circumstances of obvious potential self-dealing, such as intrafamily transfers. *See Harnett v. Doyle*, 16 Tenn.App. 302, 64 S.W.2d 227 (1932); *States v. Nashville Trust Co.*, 28 Tenn.App. 388, 190 S.W.2d 785 (1944); *Nashville Milk Producers v. Alston*, 43 Tenn.App. 257, 307 S.W.2d 66 (1957); *cf. Louis Dreyfus Corp. v. Butler*, 496 F.2d 806 (6th Cir. 1974). Although defendant, as president, did grant a security interest to himself, the new owner, Topsy Turvy, assented to the transfers as part of an arms-length transaction in which the buyer was under no compulsion to buy. There was no special relationship between Topsy Turvy and defendant. Each party had a strong

incentive to insure that capital would be sufficient to allow the bankrupt to continue doing business. Sections 313 and 314 were not intended to permit a court to second guess bona fide business judgments with the benefit of hindsight. In any event, the only evidence referred to by the Bankruptcy Judge as showing inadequate capital related not to the transfers, but to defendant's subsequent payments of debts of the bankrupt. These payments were not a part of the transfers, and in and of themselves were in no sense fraudulent.[5]

■ For the above reasons, it is the judgment of the Court that the transfers of September 11, 1975, were not fraudulent and that the defendant's security interest is valid. The judgment of the Bankruptcy Judge that the Trustee retain the proceeds from the sale of the equipment and inventory of Knox Kreations, Inc., free and clear of defendant's security interest, is reversed. The judgment of the Bankruptcy Judge that defendant's claim be subordinated is also reversed.

### The December 30, 1976 and August 19, 1977 Payments

■ The Bankruptcy Judge found that payments in 1976 and 1977 also constituted fraudulent transfers and entered judgment in favor of the Trustee against defendant for $48,196.90. These two payments represent a different problem from that of the transfers of September, 1975. In the first place, it appears that, at the time of the payments, there were substantial creditors which were not paid prior to the filing of the petition in bankruptcy. It also appears that the bankrupt was in fact insolvent at the time of the payments. Finally, recovery of these payments is not only governed by Section 70(e) but by other provisions of the Bankruptcy Act as well.

---

**5.** The Trustee also sought to rely upon Tenn. Code Ann. §§ 48–816 and 403 to set aside the September, 1975 agreements. While the Bankruptcy Judge did not reach these grounds, these statutes do not alter the decision of the Court. At most, these statutes arguably render the September agreements ultra vires. These transactions were assented to by the only shareholder, the defendant. Having found that no creditors were prejudiced by the pledge of security, there is therefore literally no one to complain of any procedural irregularity. *See Haynie v. Milan Exchange, Inc.*, 62 Tenn.App. 36, 458 S.W.2d 23 (1970).

At this time the Court is unable to reach a conclusion about the validity of these payments because the present record does not show whether the bankrupt or Topsy Turvy actually paid the $48,196.90. There is persuasive evidence that while the money was deposited into the escrow account by the bankrupt, Topsy Turvy may have simply borrowed the money from the escrow account in return for a note payable to the bankrupt for the amount paid. Furthermore, the record does not explain what, if any, debts owed by the bankrupt to Topsy Turvy may have been repaid through the escrow deposits. Given the present state of the record, it is necessary for the Court to remand this case to the Bankruptcy Judge for the taking of further proof and a determination of which entity actually made the payments in December, 1976, and August, 1977.

For the foregoing reasons, it is ORDERED that the case be, and the same hereby is, reversed, in part. It is further ORDERED that the case be, and the same hereby is, remanded.

Order Accordingly.