**REVISED**

United States Court of Appeals,

Fifth Circuit.

Nos. 96-50137, 96-50138.

In The Matter of Billy R. SHURLEY and Jane Bryant Shurley, Debtors.

Billy R. SHURLEY and Jane Bryant Shurley, Appellants,

v.

TEXAS COMMERCE BANK—AUSTIN, N.A. and Texas Commerce Bank—San Angelo, N.A., Appellees.

In The Matter of Billy R. SHURLEY and Jane Bryant Shurley, Debtors.

Billy R. SHURLEY and Jane Bryant Shurley, Appellants,

v.

TEXAS COMMERCE BANK—SAN ANGELO, N.A., Texas Commerce Bank—Austin, N.A. and Dennis Elam, Trustee, Appellees.

In The Matter of Billy R. SHURLEY and Jane Bryant Shurley, Debtors.

William H. ARMSTRONG, II, Appellant,

v.

TEXAS COMMERCE BANK—SAN ANGELO, N.A., Dennis Elam, Trustee, and Texas Commerce Bank—Austin, Appellees.

June 20, 1997.

Appeals from the United States District Court for the Western District of Texas.

Before REAVLEY, JOLLY and BENAVIDES, Circuit Judges.

REAVLEY, Circuit Judge:

The question here is to what extent the assets of a spendthrift trust settled by a bankruptcy debtor and others are

1

included in the debtor's bankruptcy estate. The bankruptcy and district courts held that the entirety of the debtor's interest in the trust is property of the bankruptcy estate. We limit the estate to the property contributed to the trust by the debtor.

BACKGROUND

In 1965 M.D. Bryant, Ethel Bryant, Anne Bryant Ridge, and Jane Bryant Shurley created a trust under Texas law. M.D. and Ethel Bryant were husband and wife. Anne Bryant Ridge and Jane Bryant Shurley are their daughters. The trust is known as the "M.D. Bryant Family Trust" or the "Bryant Family Trust."

The parents and daughters contributed real property to the trust. The property consisted of ranches owned by the family, including one owned by Shurley. Shurley contributed approximately 11,000 acres of raw land from the south of a west Texas ranch (her contribution herein the "Marfa ranch").[1] The trust agreement states that the property contributed by the parents "represents two-thirds (2/3) of the total value of all of said real property to be contributed and that the value of that portion of said real property to be contributed by [the two daughters] each represents (1/6) of the total value of all of said real property to be contributed."

The trust agreement provided that additional property could be

[1]The briefs indicate that the "Marfa Ranch" also refers to a larger tract of land out of which came the acreage Shurley contributed to the trust. In this opinion the "Marfa ranch" means only that acreage owned by Shurley and conveyed to the trust in 1965, together with any mineral interests she may have owned and conveyed to the trust.

added to the trust at a later date. According to Shurley the vast bulk of the corpus of the trust came through pourover provisions in the parents' wills, which were executed at the same time the trust agreement was executed. She claims that the Marfa ranch represents only two percent of the value of the total assets of the trust. The parents died in 1967 and 1971.

Under the trust agreement, while the parents were alive, two-thirds of the income generated by the trust was distributed to the parents and one-sixth of the income was distributed to each of the daughters. Upon the death of one parent, the income was distributed equally among the living parent and the daughters. Upon the death of the second parent, the two daughters each received half of the income if both were living at the time. The agreement has provisions for the children and other descendants of the daughters to receive income from the trust and distribution of its assets upon final termination of the trust.

In 1992, Shurley and her husband filed for bankruptcy under Chapter 7 of the Bankruptcy Code. Since Shurley's parents were deceased at the time, she and her sister each had a one-half interest in the income from the trust. The Marfa ranch was still held by the trust. Two bank creditors and the bankruptcy trustee brought an adversary action, seeking a declaratory judgment that Shurley's interest in the trust was property of the bankruptcy estate. After a trial, the bankruptcy court entered a judgment declaring that Shurley's "entire interest in the [trust], being an undivided 50 percent interest in the principal assets and income of

3

the [trust], is property of the Chapter 7 bankruptcy estate." In its memorandum opinion it enjoined the trustee of the trust "from disbursing any beneficial interest previously held by Mrs. Shurley to anyone other than" the bankruptcy trustee.[2] Shurley and the trustee of the trust[3] appealed to the district court, which affirmed. This appeal followed.

## DISCUSSION

We review the bankruptcy court's factual findings under the clearly erroneous standard, and we review its legal conclusions de novo.[4]

Under section 541 of the Bankruptcy Code[5] a bankruptcy estate is created at the commencement of the bankruptcy case. Section 541(a)(1) states that "[e]xcept as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case" is included in the estate. Subsection (c)(2) states the exclusion relevant here: "A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title."

Section 541(c)(2) excludes "spendthrift trusts" from the bankruptcy estate if such a trust protects the beneficiary from

---

[2]*In re Shurley,* 171 B.R. 769, 789 (Bankr.W.D.Tex.1994).

[3]For convenience, appellants Shurley and the trustee of the trust are sometimes collectively referred to as Shurley.

[4]*In re Herby's Foods, Inc.,* 2 F.3d 128, 130-31 (5th Cir.1993).

[5]11 U.S.C. § 541.

4

creditors under applicable state law.[6]  "In general, a spendthrift trust is one in which the right of the beneficiary to future payments of income or capital cannot be voluntarily transferred by the beneficiary or reached by his or her creditors."[7]

The Bryant Family Trust agreement vests in the trustee authority over the trust assets.  Among other powers vested in the trustee, the agreement provides:

> The trustee (and his successors) shall have full power and authority:  to manage, handle, invest, reinvest, sell for cash or credit, or for part cash and part credit, convey, exchange, hold, dispose of, lease for any period of time, whether or not longer than the life of the trust, improve, repair, maintain, work, develop, operate, use, mortgage, or pledge all or any part of the funds....  The trustee shall have full power to determine the manner in which expenses are to be borne and in which receipts are to be credited as between principal and income, and also to determine what shall constitute income or net income and what shall constitute corpus and principal.... [B]eneficiaries shall have no right or power to transfer, assign, convey, sell or encumber said trust estate and interest therein, legal or equitable, during the existence of these trusts.

The agreement expressly provides that trust assets cannot be reached by creditors of the beneficiaries.[8]

---

[6]*Patterson v. Shumate,* 504 U.S. 753, 762, 112 S.Ct. 2242, 2248, 119 L.Ed.2d 519 (1992) (noting legislative history that § 541(c)(2) "continues over the exclusion from property of the estate of the debtor's interest in a spendthrift trust to the extent the trust is protected from creditors under applicable State law."); *In re Moody,* 837 F.2d 719, 722-23 (5th Cir.1988) ("A beneficiary's interest in a spendthrift trust is excluded from his bankruptcy estate by 11 U.S.C. § 541(c)(2), if state law and the trust so provide.").

[7]*Id.* at 723.

[8]The agreement states:  "The interest of the beneficiaries in the trust estate and the increase and proceeds thereof, both legal and equitable, so long as the same are held in trust, shall not be subject in any manner to any indebtedness, judgment, judicial process, creditors' bills, attachment, garnishment, execution,

By vesting control of the trust in the trustee, denying the beneficiaries control over the trust, and denying creditors of the beneficiaries access to trust assets, the trust agreement qualifies as a spendthrift trust under Texas law. For two reasons, however, the bankruptcy court concluded that the trust assets are not beyond the reach of creditors under state law. The first reason, which we reject in part, is that spendthrift trust protection under state law does not extend to a trust settled by the beneficiary herself. The second reason, which we reject, is that Shurley exercised sufficient control over the trust to make the assets subject to her creditors.

A. *The Self-Settlor Rule and its Consequences*

The bankruptcy court's principal reason for holding that Shurley's interest in the trust is property of the bankruptcy estate is that she was one of the original settlors of the trust. We have recognized that a beneficiary's interest in a spendthrift trust is not subject to claims of creditors under Texas law "[u]nless the settlor creates the trust and makes himself beneficiary."[9] The rationale for this "self-settlor" rule is

receivership, charge, levy, seizure or encumbrance, of or against said beneficiaries; nor shall the interest of the beneficiaries in said trust be in any manner reduced or affected by any transfer, assignment, conveyance, sale, encumbrance, act, omission or mishap, voluntary or involuntary, anticipatory or otherwise of said beneficiaries...."

[9]*Id.* at 723. *See also Daniels v. Pecan Valley Ranch, Inc.,* 831 S.W.2d 372, 378 (Tex.App.—San Antonio 1992, writ denied) ("In Texas, a settlor cannot create a spendthrift trust for his own benefit and have the trust insulated from the rights of creditors."); Tex. Prop.Code Ann. § 112.035(d) ("If the settlor is also a beneficiary of the trust, a provision restraining the

obvious enough: a debtor should not be able to escape claims of his creditors by himself setting up a spendthrift trust and naming himself as beneficiary. Such a maneuver allows the debtor, in the words of appellees, to "have his cake and eat it too." As one Texas court has explained:

> Public policy does not countenance devices by which one frees his own property from liability for his debts or restricts his power of alienation of it; and it is accordingly universally recognized that one cannot settle upon himself a spendthrift or other protective trust, or purchase such a trust from another, which will be effective to protect either the income or the corpus against the claims of his creditors, or to free it from his own power of alienation. The rule applies in respect of both present and future creditors and irrespective of any fraudulent intent in the settlement or purchase of a trust.[10]

The novel issue presented here is whether the entirety of a beneficiary's interest in a spendthrift trust is subject to creditors' claims where the trust is only partially self-funded by the beneficiary. There is no compelling Texas authority on this issue, but we conclude that on these facts Texas courts would surely hold that the partially self-funded spendthrift trust is only partially subject to creditors' claims.

Allowing creditors to reach only the self-settled portion of the trust is consistent with the other long-standing rule of Texas law that a settlor should be allowed to create a spendthrift trust that shields trust assets from the beneficiary's creditors.

---

voluntary or involuntary transfer of his beneficial interest does not prevent his creditors from satisfying claims from his interest in the trust estate.").

[10]*Glass v. Carpenter,* 330 S.W.2d 530, 533 (Tex.Civ.App.—San Antonio 1959, writ ref'd n.r.e.).

"Spendthrift trusts have long been held valid by Texas courts."[11] The bankruptcy court's ruling ignores the wishes of Shurley's parents, the primary settlors of the trust, and the state's policy of respecting their expectations. "Spendthrift trusts are not sustained out of consideration for the beneficiary. Their justification is found in the right of the donor to control his bounty and secure its application according to his pleasure."[12] Allowing creditors to reach only that portion of the trust contributed by Shurley would further the policy of allowing her parents to create a spendthrift trust for the benefit of Shurley that is protected from her creditors, while giving effect to the exception for self-settled trusts. At least one court from another jurisdiction agrees with this this approach,[13] and we believe that Texas courts would do the same. Accordingly we hold that the property which Shurley herself contributed to the trust—the Marfa ranch—is not protected from creditors under state law and is therefore property of the bankruptcy estate, but that all other assets of the trust are not property of the estate.[14]

---

[11]*Moody,* 837 F.2d at 723.

[12]*Hines v. Sands,* 312 S.W.2d 275, 279 (Tex.Civ.App.—Fort Worth 1958, no writ).

[13]*In re Johannes Trust,* 191 Mich.App. 514, 479 N.W.2d 25, 29 (1991) ("[The self-settlor's] creditors can reach the assets of the trust and compel payment in the maximum amount that would be in the trustee's discretion with respect to that portion of the assets that came from [the self-settlor], but not with respect to any portion of the trust that came from other individuals, particularly petitioner.").

[14]We note that the Marfa ranch was still held by the trust when Shurley commenced her bankruptcy case. If the ranch had been sold,

8

We so hold despite Shurley's "power of appointment" granted by the trust agreement. Under the agreement each sister has a right to allocate assets of the trust to specified beneficiaries. The agreement states that the sisters "shall each have a special power of appointment over an adjusted one-half (1/2) of the trust assets, to appoint such adjusted one-half (1/2) of the assets of said trust to and among their children and lineal descendants.... Neither [daughter] can appoint assets to herself, her creditors, her estate, or the creditors of her estate." If a daughter does not exercise her power of appointment, the trust agreement provides that her interest shall be distributed in equal shares "to her children and lineal descendants, and to the lineal descendants of a deceased child, per stirpes." Shurley represents on appeal that she has not exercised her special power of appointment because she is content with the trust's distribution provisions for her descendants.

This power of appointment does not alter our conclusion that the Marfa ranch is property of the bankruptcy estate. The Bankruptcy Code expressly excludes such a power of appointment from the bankruptcy estate, since section 541(b)(1) provides that property of the estate does not include "any power that the debtor

---

prior to the bankruptcy filing, this case would be more complicated. We would still hold that some portion of Shurley's interest in the trust was self-settled and therefore property of the estate, but would have to engage in a further analysis of (1) how to value the self-settled portion of the trust, through tracing of assets or some other method of calculating Shurley's proportionate contribution to the trust relative to the other settlors' contributions, and (2) who should have the burden of proof on this issue.

may exercise solely for the benefit of an entity other than the debtor." However, while the *power* of appointment to others does not become property of the estate under § 541(b)(1), the *property* which became part of the bankruptcy estate under the Code upon the commencement of the bankruptcy case now belongs to that estate and is controlled by the bankruptcy trustee. Regardless of how Shurley might indicate that trust assets should be divided upon her death, the Marfa ranch now belongs to the bankruptcy estate, and her designation of beneficiaries is irrelevant. The bankruptcy estate will be divided among creditors according to the Code, regardless of Shirley's appointment of assets under the trust agreement.

The exercise of the power of appointment under the trust agreement is analogous to a will, and has no more effect on the property of the bankruptcy estate and creditor priorities than a garden-variety will of the debtor. With an ordinary will, the heirs only receive the stipulated items of the property that were owned by the testator. Stated more simply, a testator can only give away that which was hers. Here, the Marfa ranch no longer belongs to Shurley; it is property of the bankruptcy estate.

Shurley argues that she only has a life estate in the Marfa ranch and other trust assets in the form of an equitable interest in the income from the trust assets during her life, and that creditors therefore cannot reach the corpus of the trust even if it is self-settled. She is correct that absent distributions of corpus at the discretion of the trustee or a premature termination of the trust (discussed below), the trust agreement only provides

10

her with an income interest in the trust assets, with the remainder going to other beneficiaries. Shurley cites authority that even when a settlor creates a trust for herself, creditors can only reach trust assets to the extent of the settlor's interest.[15]

The issue here—whether the creditors can reach only Shurley's income from the Marfa ranch or the ranch itself—does not turn on whether the Shurley's interest in the trust is "equitable," since the Bankruptcy Code defines property of the bankruptcy estate to include "all legal or equitable interests of the debtor in property."[16] Resolution of this question turns on whether creditors can reach the trust corpus under state law, regardless of how the interest is characterized.

We conclude that under Texas law creditors can reach not only Shurley's income from the Marfa ranch but the ranch itself, in light of *Bank of Dallas v. Republic National Bank of Dallas.*[17] In *Bank of Dallas,* the debtor settled a trust with spendthrift language for the benefit of herself and her children. The debtor was to receive the net income of the trust during her lifetime, with the remainder going to her children or other beneficiaries named in her will. The trust agreement further provided that "[w]henever the trustee determines that the income of the Settlor

---

[15]*E.g., Fordyce v. Fordyce,* 80 Misc.2d 909, 365 N.Y.S.2d 323, 328 (N.Y.Sup.Ct.1974) ("Even in the case of a self-settled trust, creditors can only reach the interest the settlor retained for himself.").

[16]11 U.S.C. § 541(a)(1).

[17]540 S.W.2d 499 (Tex.Civ.App.—Waco 1976, writ ref'd n.r.e.)

from all sources known to the trustee is not sufficient for her reasonable support, comfort, and health and for reasonable support and education of Settlor's descendants, the trustee may in its discretion pay to, or use for the benefit of, Settlor or one or more of Settlor's descendants so much of the principal as the trustee determined to be required for those purposes."

The court held that "where a settlor creates a trust for his own benefit, and inserts a spendthrift clause, it is void as far as then existing or future creditors are concerned, and they can reach his interest under the trust by garnishment."[18]  It further held that income from the trust was subject to creditor claims, and that "the interest of [the debtor] in the trust is such that the corpus may be reached by her creditors."[19]

The court considered the Restatement (Second) of Trusts § 156 (1959), which provides:

(1) Where a person creates for his own benefit a trust with a provision restraining the voluntary or involuntary transfer of his interest, his transferee or creditors can reach his interest.

(2) Where a person creates for his own benefit a trust for support or a discretionary trust, his transferee or creditors can reach the maximum amount which the trustee under the terms of the trust could pay to him or apply for his benefit.

The court also looked to comment e of this section, which states that "[w]here by the terms of the trust a trustee is to pay the settlor or apply for his benefit as much of the income or principal as the trustee may in his discretion determine, his

---

[18]*Id.* at 501.

[19]*Id.* at 501-02.

transferee or creditors can reach the maximum amount which the trustee could pay to him or apply for his benefit." Applying these rules the court held that the creditor could reach the corpus of the trust, even though the debtor only had a life interest in the trust.

By this reasoning the creditors are able to reach the self-settled asset of the trust in our case, namely the Marfa ranch. The trust agreement states that "[i]f the trustee determines that the net income of said trust is insufficient to maintain and support any of the beneficiaries of said trust or their children and lineal descendants in their accustomed manner of living, taking into account, however, such beneficiary's income from all other sources, the trustee may use so much of the corpus of said trust as the trustee sees fit to make up such deficiency." This language is even broader than the language of the trust agreement in *Bank of Dallas,* since in our case the trustee can make grants of trust corpus to support the beneficiaries' or their descendants' "accustomed manner of living," while in *Bank of Dallas* the trustee was limited to making such distributions to support the beneficiary's "reasonable support, comfort, and health" and the reasonable support and education her descendants. If anything, the former term grants even more discretion to the trustee than the latter. Accordingly we conclude that the creditors in our case can reach the corpus of the trust under Texas law as to that property—the Marfa ranch—contributed by Shurley to the trust, and that the ranch is therefore property of the estate.

13

The court in *Bank of Dallas* also quoted comment c to § 156, which states that "[i]f the settlor reserves for his own benefit not only a life interest but also a general power to appoint the remainder by deed or will or by deed only or by will alone, the creditors can reach the principal of the trust as well as the income." In *Bank of Dallas* the debtor apparently had a general power to appoint the remaining trust assets by will, while in our case Shurley and her sister have a special power of appointment, meaning that the trust document limits the choice of recipients of appointed assets to the sisters' descendants. We do not see this factual distinction as significant. Comment c was only one of three comments to § 156 (comments c, d, and e) quoted by the court in *Bank of Dallas,* and § 156 itself, as we read it, states than any self-settled support or discretionary trust is subject to creditor claims up to "the maximum amount which the trustee under the terms of the trust could pay to" the beneficiary. We cannot fathom why the court would have reached a different result if the debtor had had a special rather than a general power of appointment. Before even mentioning the Restatement, the court stated without qualification that, under Texas law, "where a settlor creates a trust for his own benefit, and inserts a spendthrift clause, it is void as far as then existing or future creditors are concerned, and they can reach his interest under the trust by garnishment."[20]

A similar result was reached in *State v. Nashville Trust Co.*[21]

[20]*Bank of Dallas,* 540 S.W.2d at 501.

[21]28 Tenn.App. 388, 190 S.W.2d 785 (1944).

The debtor was the beneficiary of a spendthrift trust holding real estate. The debtor built a mansion on the property. The court held that the debtor had self-settled the trust to the extent of the improvements he had made, and that the property was therefore subject to the creditor's claim to the extent of the debtor's improvements. The debtor argued that even if he "can be held to have contributed to the trust property, enhanced its value, and to that extent created a spendthrift trust for his own benefit, only his interest in such enhancement, i.e. his life estate in such enhancement, may be subjected and that the remainder interest of his children ... may not be subjected for any debt of his."[22] The court rejected this argument, reasoning that the debtor's children "could only be donees or volunteers and could take no benefits under such transfer as against his creditors. So we think the chancellor did not err against defendants in decreeing that the [creditor] had a right to subject the land for the amount by which its value had been enhanced by reason of the improvements."[23] The court held that the creditor was entitled to a lien on the trust property for the value of the debtor's improvements, and that the creditor was "entitled to a sale of the land, if necessary, to enforce the lien."[24]

Shurley argues that creditors cannot reach the corpus of the trust because of our decisions in *In re Goff*, 706 F.2d 574 (5th

---

[22]*Id.* 190 S.W.2d at 791.

[23]*Id.* at 792.

[24]*Id.* at 799.

15

Cir.1983) (*Goff I),* and *In re Goff,* 812 F.2d 931 (5th Cir.1987) (*Goff II* ).  In *Goff I* we held that the debtor's Keogh plan, a pension trust under the ERISA statute,[25] was not a spendthrift trust excluded from the bankruptcy estate under Bankruptcy Code § 541(c)(2) because it was self-funded.  We stated that "[t]he general rule is well established that if a settlor creates a trust for his own benefit and inserts a "spendthrift' clause, restraining alienation or assignment, it is void as far as creditors are concerned and they can reach the settlor's interest in the trust."[26]

In *Goff II,* a creditor claimed that its recorded judgment against the debtor gave it a statutory lien against the property held in the pension trust, and that it therefore had a secured bankruptcy claim.  The bankruptcy trustee argued that the claim was unsecured.  We held that the claim was unsecured, because under Texas law a judgment lien only attaches to real property in which the debtor has legal title, and the debtor only had equitable title to the real property in the trust.  We stated that "[t]he trust remains valid;  only the spendthrift clause is void, allowing creditors to reach the property held in trust by garnishment."[27] *Goff II* did not, as appellants argue, hold that creditors cannot

_____

[25] 29 U.S.C. §§ 1001 *et seq.*

[26] *Goff I,* 706 F.2d at 587.  The principal holding of the case—that a qualified ERISA pension plan is not excluded from the bankruptcy estate because the federal ERISA statute is not "applicable nonbankruptcy law" under Bankruptcy Code § 541(c)(2)—was expressly overruled in *Patterson,* 504 U.S. at 757 n. 1, 112 S.Ct. at 2246 n. 1 (citing *Goff I* ).

[27] *Goff II,* 812 F.2d at 933.

16

reach the corpus of a self-funded trust with an invalid spendthrift clause. It held only that a judgment lien against the debtor did not create a secured claim against the assets of the trust. We have cited *Goff II* for the proposition that "[a] creditor can reach the trust assets" of a trust funded by the debtor-beneficiary.[28] As with the Bryant Family Trust, the trust in question (1) contained a spendthrift clause, (2) provided the debtor with a life interest in the income, with the remainder going to other beneficiaries, and (3) provided that the trustee could invade the corpus of the trust for the debtor's support, maintenance and welfare.

Shurley points out that when she made the original contribution of the Marfa ranch to the trust, it was subject to a note and lien. She argues that this lien should affect our analysis, but we disagree. There is no dispute that Shurley was the owner of the ranch when she conveyed it to the trust, even if it was encumbered with a lien. The note and lien may have affected the value of the property at the time the trust was funded, but they did not affect ownership of the property. When determining the property of the estate, the Bankruptcy Code looks to the debtor's property "as of the commencement of the case."[29] It makes no more sense to look to the value of the ranch at the time of the creation of the trust than in does to look to the value of any other property of the debtor on the date of acquisition. If the

---

[28]*In re Latham,* 823 F.2d 108, 111 (5th Cir.1987).

[29]11 U.S.C. § 541(a)(1).

17

debtor owns stock, bonds, real estate or other property, the original value or cost basis of those assets is irrelevant to the bankruptcy matter of defining the estate. Accordingly a lien on the ranch at the time of the trust's creation does not alter our conclusion that the ranch is property of the bankruptcy estate. The ranch might have appreciated or depreciated in value for any number of reasons since 1965, including the balance on the note, but it is still property of the bankruptcy estate.

Shurley argues that there was no proof by appellees that she had any equity in the ranch at the time of creation of the trust, reasoning that she could not be a self-settlor if the property she contributed was worthless. Assuming that Shurley is legally correct—that a settlor's contribution to a trust of real property in which she had no equity at the time of the trust's creation does not fall within the self-settlor rule—the bankruptcy court found that she had equity in the property at the time of the creation of the trust in 1965.[30] This fact finding is not clearly erroneous. Shurley purchased the ranch from her parents in 1950 for $131,366.64 and assumed a $50,000 balance on the note.[31] The balance on the note was only $23,000 when the property was conveyed to the trust.[32] Moreover, in the trust agreement itself, Shurley as a signatory represented that "the value of that portion of said

---

[30]*Shurley,* 171 B.R. at 778-79 n. 5.

[31]Shurley paid only $200 down for the ranch, and executed 25 separate promissory notes to her parents, which were annually forgiven by the parents.

[32]The note was subsequently paid off by the trust.

18

real property to be contributed by [Shurley and her sister] each represents (1/6) of the total value of all of said real property to be contributed." This declaration is an admission by Shurley that the property she contributed had some value, exceeding the balance on the note, since the trust assumed the note.

B. *Beneficiary Control*

The bankruptcy court concluded that "[e]ither substantial control or self-settlement may operate to invalidate protective trust provisions."[33] It found that Shurley exercised too much control over the trust to qualify as the beneficiary of a spendthrift trust. We find none of the reasons given persuasive.[34]

First, the court found that "Mrs. Shurley, in conjunction with her father during his life, had the power to revoke, alter, or amend the Trust document, or distribute the Trust assets back to the settlors."[35] We disagree. The agreement provides that "M.D. Bryant (the father) with the concurrence of either Settlor Anne Bryant Ridge or Settlor Jane Bryant Shurley, shall have the right at any time during his lifetime to revoke, alter and amend said trust and distribute the assets of said trust to the Settlors in the same proportion as the original contributions by each of said Settlor, taking into account any adjustment under paragraph (b)."

---

[33]*Shurley,* 171 B.R. at 782.

[34]We assume without deciding that the court was legally correct in concluding that "substantial control" can render a spendthrift or other protective trust subject to creditor claims. We note however that we do not believe that appellees have cited any Texas authority for this proposition.

[35]*Id.* at 783.

The power to revoke or amend the trust was vested in the father, not the daughters. Shurley had no authority to alter the trust. She only had the authority to prevent her father from doing so, and only if she and her sister vetoed the change. At most therefore she and her sister in combination had the power to ensure the perpetuation of the trust. Further, this power lapsed upon the death of the father in 1967. We find no authority that such a limited power rendered the trust subject of creditor claims against the beneficiaries.

Second, the bankruptcy court noted that the agreement provided that Shurley had the right to petition three "special trustees" for the partial or complete termination of the trust. The agreement provides for the appointment of certain named special trustees, including a state judge, after the death of the parents. It states that "[u]pon application made by either daughter ... or both, showing that termination would best serve the intended purpose of the trust, such Special Trustees shall in their sole and absolute discretion have the power and authority by unanimous consent to terminate in whole or in part and from time to time the trust or trusts established hereunder." Again, this provision does not vest in Shurley the power to terminate or alter the trust. It only authorizes her to request such a change from special trustees, who have "in their sole and absolute discretion" the authority to alter the trust. Even absent such a provision, Shurley, like all Texas trust beneficiaries, had a statutory right to seek judicial modification or termination of the trust if "compliance with the

20

terms of the trust would defeat or substantially impair the accomplishment of the purposes of the trust."[36]  No court has ever held that such a statutory right renders a spendthrift trust subject to creditor claims.

Third, the bankruptcy court noted Shurley's special power of appointment.  This provision merely gave the daughters the authority to allocate trust assets to their descendants.  It grants no authority to the daughters to allocate assets to themselves.  As explained above, the Bankruptcy Code expressly excludes such a power of appointment from the bankruptcy estate.  Section 541(b)(1) of the Code provides that property of the estate does not include "any power that the debtor may exercise solely for the benefit of an entity other than the debtor."

Aside from the terms of the trust agreement, the bankruptcy court found that Shurley had exercised de facto control over the trust.  The court found:

> Outside the Trust document, the Shurleys also manipulated Trust assets and governed the initial Trustee, Bryant Williams.  The Shurleys were regularly able to obtain unrestricted corpus distributions and loans.  While the Trust provides for such distributions, the liberality and circumstances under which they were requested and granted suggested a domination by M.D. Bryant, Mrs. Shurley and Mrs. Watkins of Mr. Williams.  Only recently had any corpus distribution request been denied, and only recently had the successor Trustee, Mr. Armstrong, started to make only "loans," to the exclusion of corpus distributions.  Indeed, in the early days of the Trust, the initial Trustee, on behalf of the Trust, executed promissory notes as a comaker for the Shurleys.  Part of the malleability of Bryant Williams may have arisen either from his fear of being replaced for failing to abide by the wishes of Mrs. Shurley and Mrs. Watkins, or from his close relationship with the family.  While M.D.

---

[36]Tex. Prop.Code Ann. § 112.054 (Vernon 1995).

21

> Bryant, the Shurleys and the Watkines may not have held *all* of the puppet strings to Mr. Williams, they held enough of them to exert the control necessary to defeat the Trust's protective attributes.[37]

Shurley strongly denies that the evidence at trial supported these findings, arguing for example that there is no evidence that the first trustee ever made a single distribution of trust corpus or a single loan to Shurley or any other beneficiary. Appellees argue that in addition to the above-quoted findings, Shurley, among other things, "used the Trust income to induce extensions of credit to herself and her husband," and "engaged in "trustee shopping' to help further her control of the trust assets."

Even if these findings are taken as undisputed, they do not establish control by the daughters over the trust assets sufficient to make the trust subject to their creditors. The fact that the trustees liberally bestowed trust assets on the daughters, by itself, does not establish de facto control by the daughters over the affairs of the estate. The daughters were after all two of the principal beneficiaries of the trust, and distributions of the wealth of the the trust to the daughters is entirely consistent with its apparent purpose. The agreement provides that the trustee was not limited to distributing income generated from the corpus of the trust. As discussed above, it expressly authorized the trustee to make distributions from the trust corpus "[i]f the trustee determines that the net income of said trust is insufficient to maintain and support any of the beneficiaries of said trust or

---

[37]*Shurley,* 171 B.R. at 783.

22

their children and lineal descendants in their accustomed manner of living...."  It also expressly authorized the trustee to "loan money to ... and otherwise deal with any and all persons" including "the beneficiaries of this trust."

As one Texas decision has explained in denying a creditor's claim against assets held by a spendthrift trust:

> the purpose of such a trust is not defeated by the fact that the trustee is authorized in his discretion to apply a part of the corpus of the fund to the use of the beneficiary in accordance with the terms of the trust.  Neither is the purpose of such trust defeated by the fact that the trustee is authorized or even required to turn the entire trust fund or property over to the beneficiary absolutely at some fixed time in the future.[38]

Appellees did not establish that loans or grants from the trust to the daughters, on their face consistent with the purpose and language of the trust, amounted to de facto control of the trust by the daughters.  Further, the fact that the beneficiary of a spendthrift trust may have behaved as a spendthrift only shows the prescience of the settlors, and should not defeat the protective features of the trust. Appellees' focus on the behavior of Shurley as beneficiary is misplaced, since as explained above, spendthrift trusts are not shielded from creditors "out of consideration for the beneficiary.  Their justification is found in the right of the donor to control his bounty and secure its application according to his pleasure."[39]

---

[38]*Adams v. Williams,* 112 Tex. 469, 248 S.W. 673, 679 (1923).

[39]*Hines v. Sands* 312 S.W.2d 275, 279 (Tex.Civ.App.—Fort Worth 1958, no writ).

C. *Whether the Trust Is an Annuity*

By separate appeal Shurley argues that the bankruptcy court erred in denying her summary judgment motion urging that her interest in the trust is an "annuity" exempt from creditors under Texas law.

Under Texas law and Bankruptcy Code § 522, Texas debtors may elect either state or federal exemptions from creditors.[40] Shurley's claims that her interest in the trust is an annuity exempt from creditors under Tex. Ins. Code Ann. art. 21.22 (Vernon Supp.1997), which provides an exemption for "all money or benefits of any kind, including policy proceeds and cash values, to be paid or rendered to the insured or any beneficiary under any policy of insurance *or annuity contract* issued by a life, health or accident insurance company, including mutual and fraternal insurance, or under any plan or program of annuities and benefits in use by an employer *or individual.*"  The emphasized language was added by a 1993 amendment to the statute, after Shurley filed for bankruptcy.

This argument fails for two reasons.  First, her interest in the trust was not issued by an insurance company or employer, so the only conceivable claim of exemption is that her interest is part of a "plan or program of annuities and benefits in use by an ... individual."  The reference to an individual was added to the statute after the bankruptcy filing.  In determining exemptions we must apply the law in effect at the time the debtor entered

---

[40]*In re Walden,* 12 F.3d 445, 448 (5th Cir.1994).

24

bankruptcy.[41]   Although Texas exemption laws are liberally construed,[42] the exemption Shurley claims simply did not exist at the commencement of her bankruptcy case.  We cannot agree with Shurley that the 1993 amendment merely "clarified" legislative intent insofar as it added a reference to non-employer annuities that are not issued by insurance companies.[43]  The statute plainly did not apply to such annuities prior to the amendment.

Second, we do not believe that Shurley's trust interest can be characterized as an annuity in any event.  One Texas court has described an annuity as a "a form of investment which pays periodically during the life of the annuitant or during a term fixed by contract rather than on the occurrence of a future contingency."[44]  We have cited this same definition with approval.[45] While all annuities do not make payments in fixed, predetermined

---

[41]*Walden,* 12 F.3d at 449 n. 7. In so holding, *Walden* was interpreting the same state statute at issue here, Insurance Code art. 21.22

[42]*Id.* at 448.

[43]We assume without deciding that Shurley is correct that an annuity under the current statute can be issued by an entity other than an insurance company. *But see* art. 21.22(6) ("For purposes of regulation under this code, an annuity contract issued by a life, health, or accident insurance company, including a mutual company or fraternal company, or under any plan or program of annuities or benefits in use by an employer or individual, shall be considered a policy or contract on insurance.").  Texas, like all states, comprehensively regulates insurers and insurance policies.

[44]*Steves & Sons, Inc. v. House of Doors, Inc.,* 749 S.W.2d 172, 175 (Tex.App.—San Antonio 1988, writ denied) (quoting *In re Howerton,* 21 B.R. 621 (Bankr.N.D.Tex.1982)).

[45]*In re Young,* 806 F.2d 1303, 1306 (5th Cir.1987) (quoting *Howerton* ).

amounts,[46] we do not believe that the term extends to a trust where future payments are highly contingent on the future circumstances of the beneficiaries. The trust agreement provides that the trustee "may" make distributions of trust corpus if he determines that such distributions are needed to "maintain and support any of the beneficiaries or their children or lineal descendants in their accustomed manner of living." Any such good faith determination by the trustee is "final and binding on all interested parties." Such distributions were in fact made. By design, such distributions are tied to contingencies unknown at the time of the creation of the trust, and are not consistent with the concept that an annuity makes payments without regard to "the occurrence of a future contingency."[47] In addition, under terms of the trust agreement discussed above, payments to Shurley were contingent on (1) the death of her parents, since her interest increased on the death of one parent and increased again on the death of the second parent, (2) whether the father, with the consent of either sister, chose to terminate the trust, and (3) whether the special trustees terminated the trust.

Further, Shurley's argument simply proves too much, since if her interest in the trust is an annuity, then all beneficiaries of self-settled trusts could make the same argument, as long as the

---

[46]With a variable annuity, "payments to the purchaser vary with investment performance." *NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 254, 115 S.Ct. 810, 812, 130 L.Ed.2d 740 (1995).

[47]*Steves & Sons,* 749 S.W.2d at 175.

trust agreement called for periodic payments to the settlor for life or a fixed term. We cannot accept that the Texas legislature intended this result, which would reject the universally recognized rule, and one codified by Texas statute, that a settlor cannot create his own spendthrift trust and shield its assets from creditors. If the legislature had intended this result, it would have repealed Tex. Prop.Code Ann. § 112.035(d), which provides that "[i]f the settlor is also a beneficiary of the trust, a provision restraining the voluntary or involuntary transfer of his beneficial interest does not prevent his creditors from satisfying claims from his interest in the trust estate."

## CONCLUSION

In summary, we conclude that the Marfa ranch and income generated therefrom is property of the estate.[48] The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

REVERSED and REMANDED.

---

[48]Income from the ranch belongs to the estate because the Bankruptcy Code defines property of the estate to include "[p]roceeds, product, offspring, rents, or profits of or from property of the estate." 11 U.S.C. § 541(a)(6).